NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 17a0518n.06

Case No. 16-2521

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Sep 06, 2017
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| MARIA KULPA, as Personal Representative for the Estate of Bronislaw Kulpa, | ) ) ) | |
| Plaintiff-Appellant, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| v. | ) ) | |
| JOHN CANTEA, et al., | ) ) | |
| Defendants-Appellees. | ) | |

BEFORE: BATCHELDER, GIBBONS, and COOK, Circuit Judges.

COOK, Circuit Judge. Bronislaw Kulpa, a pretrial detainee in the Macomb County Corrections Facility, died after a 300-pound officer knelt on his back while he lay prone and handcuffed. Maria Kulpa sued on her deceased husband's behalf, alleging that the officer used excessive force, other on-the-scene officers failed to intervene, the officers deliberately disregarded Kulpa's serious medical needs, and the county failed to train its officers properly. The district court granted summary judgment to the officers, reasoning that they violated no clearly established constitutional right. The court also dismissed the county, explaining that plaintiff failed to show a training deficiency.[1] We reverse in part and affirm in part.

---

[1] Plaintiff also sued Correct Care Solutions LLC and Jackie Hand, a nurse at the facility. The district court granted summary judgment in these two defendants' favor. Plaintiff declined to challenge that ruling on appeal.

**I.**

**A.  The Officers Take Kulpa to a Holding Cell**

On the morning of October 4, 2011, Officer Kenneth Cucchiara, a corrections officer at the Macomb County Corrections Facility, heard yells echoing down the jail's hall.  R. 58-18, Cucchiara Dep. 34.  He determined that the yells originated from cell D-3, a detox unit holding roughly ten inmates.  *Id.* at 35, 41.  The cell's inmates pointed to a 63-year-old man, later identified as Bronislaw Kulpa, sitting on the toilet with his pants up, sniffing a sponge, and screaming.  *Id.* at 36.  When Cucchiara approached, Kulpa said "fuck you and leave me alone," and shouted unintelligibly.  *Id.* at 37–38.  After observing Kulpa, Cucchiara walked to the medical unit to report Kulpa's odd behavior.  *Id.* at 39.  A nurse asked Cucchiara to bring Kulpa to the medical unit for evaluation.  *Id.*

Cucchiara returned to D-3, opened the cell door, and told Kulpa that he needed to go to the medical unit.  *Id.* at 45.  Kulpa replied that he didn't want to go and pushed Cucchiara against the wall before walking toward a window at the end of the hall.  *Id.*  Kulpa banged on the window and continued to holler.  *Id.*

After hearing the yells, another officer, Donna Mileski, arrived on scene, and the two officers handcuffed Kulpa behind his back.  *Id.* at 47.  They then led Kulpa toward the medical unit, each officer gripping one of Kulpa's arms.  While walking down the hall, the three tumbled suddenly to the ground.  An officer who witnessed the fall testified that Kulpa intentionally pulled the transporting officers down, R. 58-17, Cantea Dep. 54, but a security video shows that Kulpa's pants dropped to his mid-thighs, causing him to trip, Video a2d 8:46:39.

Following the fall, Officer John Cantea stepped in to replace Mileski.  Cantea stands 5'10" and weighs approximately 300 pounds.  R. 58-17, Cantea Dep. 48.  Cantea and Cucchiara

decided to bypass medical, instead taking Kulpa to a holding cell because Kulpa showed "active resistance" and needed to be restrained "so that medical [could] assess him without him harming the medical staff." R. 58-18, Cucchiara Dep. 53–54.

### B.     The Officers Restrain Kulpa in the Holding Cell

The officers dragged Kulpa into an empty cell and placed him facedown. Video a7 8:49:01–05. They testified that they planned to remove the handcuffs so that they could strap Kulpa into a restraining chair to await a medical evaluation. R. 58-18, Cucchiara Dep. 53–55. A camera in the cell recorded the following events.

Once on the ground, Cantea quickly placed his left knee on Kulpa's left side. Video a7 8:49:06. Because other officers obscure the view, the video doesn't show exactly where Cantea positioned his knee. In the report that he filed immediately following the encounter, Cantea wrote that he "placed [his] left shin between [Kulpa's] shoulder blades." R. 58-17, Cantea Dep. 70. Similarly, the prison's investigation report states that in a later interview Cantea "was very specific regarding the placement of his knees . . . . He describes how he . . . plac[ed] his left knee down in between Kulpa's shoulder blades and his right knee on the small of [Kulpa's] back." R. 71-3, Investigation, PID 1210. Cantea changed his story during his deposition, testifying that he placed his left knee "on [Kulpa's] left side on his left shoulder" and his "[r]ight knee was at [Kulpa's] left upper buttocks." R. 58-17, Cantea Dep. 62, 64.

After a few seconds facedown, Kulpa rolled onto his left side so that his right hip lifted off the ground. Video a7 8:49:14. While on his side, his right leg flailed weakly without striking any of the officers. Video a7 8:49:17; R. 58-22, Gabriel Dep. 15. Cantea pressed both knees into Kulpa's back, allowing him to roll Kulpa onto his chest. Video a7 8:49:16–19; R. 58-17, Cantea Dep. 122. Although another officer blocks the camera's view of Cantea's knee

placement, Cantea appears to center himself over Kulpa's trunk. Video a7 8:49:20–40; Handheld Video 00:41. Three other officers planted their feet onto Kulpa's legs, preventing further movement. *Id.* Kulpa's last discernible physical movement occurred at 8:49:43. Cantea removed his left knee from Kulpa's upper body at 8:50:02, and lifted his right knee from Kulpa's lower back or buttocks at 8:50:23.

After uncuffing Kulpa, Cucchiara and Cantea pulled Kulpa from the ground, and together they lifted him into a restraining chair just outside the cell. Video a7 8:50:27–35; Handheld Video 1:15–28. According to a handheld camera that recorded the events, Kulpa appears unconscious in the restraining chair: head tilted back, eyes closed, body motionless. Handheld Video 1:27–59. When the officers rolled the chair back into the cell, Kulpa slumped to the left, his left shoulder and head hanging off the chair's back. Handheld Video 2:05; Video a7 8:51:08. Inside the room, four officers strapped Kulpa into the chair. One officer picked up Kulpa's limp left arm, causing Kulpa's head to shift to the right onto the chair's headrest. Video a7 8:51:16. They also strapped down his shoulders, and an officer repositioned him by pushing his shoulders slightly forward, causing his head to loll to the right before re-centering. Video a7 8:51:33–41.

The four officers then left the room. Video a7 8:52:02–10. Cucchiara reentered a few seconds later to check the restraints before walking back to his duty station to write his report. R. 58-18, Cucchiara Dep. 72–73; Video a7 8:52:29–39. Cantea returned to his duty station. R. 58-17, Cantea Dep. 139.

Officer Pamela Peck-Gagne entered the cell to inspect Kulpa at 8:55:53, roughly three-and-a-half minutes after the other officers' departure. She discovered Kulpa unconscious, and when her effort to rouse him failed, she "started yelling for help, somebody get medical, call an ambulance." Video a7 8:55:58–8:56:11; R. 58-24, Peck-Gagne Dep. 36. Video shows her

reentering the room a few seconds later with another officer, a nurse, and a doctor who began CPR. Video a7 8:56:19–30. The CPR failed to revive Kulpa, and the medical staff stopped resuscitation efforts at 9:23.

### C. Medical Evidence

The autopsy report designated the official cause of death as "Arteriosclerotic and Hypertensive Heart Disease Exacerbated by Physical Exertion and Restraint." R. 58-28, Autopsy Report, PID 733. In layman's terms, Kulpa suffered a heart attack while struggling with the officers.

Dr. Michael Baden, the former deputy chief medical examiner for New York City, R. 71-7, Baden Dep. 67, offered a more specific explanation. He testified that Kulpa "died because he couldn't breathe. . . . He died of asphyxiation." *Id.* at 195. According to Dr. Baden, "[w]hile he was on the ground with pressure on his back, this prevented him from breathing properly, and diminished the amount of oxygen going to his brain. That process of pressure on his back in the restraint position he was in diminished his oxygen level," causing death. *Id.* at 197. He concluded that Kulpa's cardiac arrest was "triggered by lower oxygen level[s] in the blood going to the heart, or it could [have been] due to just the compression of the chest while . . . pressing on the back." *Id.* at 297.

Similarly, Dr. Charles Landers opined that Kulpa died of "profound hypoxia"—an absence of oxygen in the blood. R. 71-5, Landers Dep. 177. Pressure "restrict[ed] [the] movement of the chest which result[ed] in decreased gas exchange"—in other words, prevented the lungs from exchanging oxygen and carbon dioxide. *Id.* at 198. According to Landers, the lower blood-oxygen level caused Kulpa's heart to stop. *Id.* at 54, 201.

**II.**

We review the grant of summary judgment de novo, construing all facts and drawing all inferences in the light most favorable to the non-moving party. *Brown v. Battle Creek Police Dep't*, 844 F.3d 556, 565 (6th Cir. 2016). Plaintiff argues that the district court erred in granting the officers qualified immunity. Specifically, she contends that: (1) Officer Cantea used excessive force when he applied 300 pounds of weight to Kulpa's back; (2) other officers failed to intervene to stop Cantea's use of excessive force; and (3) the defendants disregarded a substantial risk of serious harm to Kulpa's health because Kulpa was visibly unconscious, yet none of the officers offered emergency medical aid. Because the officers seek qualified immunity, plaintiff bears the burden of showing that their acts violated a constitutional right that was clearly established at the time of the defendants' alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

### A.    *Excessive Force*

We begin with plaintiff's excessive-force claim against Officer Cantea. An excessive-force claim may arise under the Fourth, Eighth, or Fourteenth Amendments depending on "whether the plaintiff was a free citizen, convicted prisoner, or fit in some gray area in between the two." *Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013). Here, the parties agree that Kulpa's pretrial-detainee status requires the court to evaluate his claims under the Fourteenth Amendment.

#### 1.    *Constitutional Violation*

To establish a Fourteenth Amendment excessive-force claim, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively

unreasonable." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015). This mirrors the Fourth Amendment's reasonableness standard. *Clay v. Emmi*, 797 F.3d 364, 369 (6th Cir. 2015).

In *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893 (6th Cir. 2004), we addressed the reasonableness of an officer's actions in circumstances similar to those that took place here. The police responded to reports of a mentally disturbed man hitting and biting himself. Several officers pepper sprayed the man and took him to the ground, where he continued "to squirm and move around," and "kick[] violently." *Id.* at 897. Officers "put pressure on [the man's] back while he was prone on the ground" and handcuffed, immediately precipitating his death. *Id.* at 898.

We held that the law "clearly established that putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force." *Id.* at 903. We explained that "[c]reating asphyxiating conditions by putting substantial or significant pressure, such as body weight, on the back of an incapacitated and bound suspect constitutes objectively unreasonable excessive force." *Id.* "No reasonable officer would continue to put pressure on that arrestee's back after the arrestee was subdued by handcuffs, an ankle restraint, and a police officer holding the arrestee's legs." *Id.* at 905.

A jury could reasonably find that Cantea used excessive force when restraining Kulpa. Consider first the events leading up to the decision to take Kulpa to the holding cell. Typically, when an officer seeks to restrain a person suspected of a violent crime, the officer may justifiably use substantial force. *Graham v. Connor*, 490 U.S. 386, 396 (1989). Here, by contrast, the officers removed Kulpa from the cell so that a nurse could evaluate him. And a jury could find that the officers knew that Kulpa, like the *Champion* plaintiff, suffered from mental illness given

his placement in a detox cell, strange behavior, and incoherent babbling. In fact, the handheld camera recorded officers saying that he is "detoxing" and "DTing." *See Champion*, 380 F.3d at 904 (noting that courts should take the mental state of an "unarmed detainee . . . into account when assessing the amount of force exerted").

What's more, a jury could determine that Kulpa posed no threat to the officers, given his incapacitation. *See Kingsley*, 135 S. Ct. at 2473. The officers knew that Kulpa was an unarmed 63-year-old man and that handcuffs bound his hands behind his back. Six officers surrounded him once he lay prone on the ground. In the holding cell, he "resisted" only by turning onto his left side and moving his right leg. Video a7 8:49:17. And once Cantea knelt on Kulpa's back, three other officers secured Kulpa's legs with their feet, preventing further movement. Indeed, Kulpa's squirming posed less of a threat than the arrestee in *Champion*, who "kick[ed] violently" while on the ground. 380 F.3d at 897. And in any event, Cantea continued to kneel on Kulpa's back for nearly forty-five seconds even after Kulpa ceased moving.

Finally, a jury could find that the video shows Cantea applying excessive pressure to Kulpa's torso, causing Kulpa to lose consciousness. This interpretation of the video is supported by the autopsy, which revealed broken ribs along Kulpa's left side. Although CPR may have caused the fractures, Dr. Baden testified that "it's more likely the back pressure than the CPR" caused the injury. R. 71-7, Baden Dep. 270; R. 71-5, Landers Dep. 162.

From this evidence, a jury could reasonably determine that Cantea used excessive force in violation of the Fourteenth Amendment when he "put[] substantial or significant pressure on [Kulpa's] back while [Kulpa was] in a face-down prone position after being subdued and/or incapacitated." *Champion*, 380 F.3d at 903.

### 2. *Clearly Established*

Cantea argues that even if his conduct was objectively unreasonable, the law's contours were not clearly established at the time of the alleged violation with respect to the restraint of pretrial detainees. The gist of his argument is that because the events in this case took place before the Supreme Court adopted the objective reasonableness standard in *Kingsley*, no clearly established law barred unreasonable force against pretrial detainees.

At the time of Kulpa's death in October 2011, we evaluated a pretrial detainee's excessive-force claim by asking "whether the force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Griffin v. Hardrick*, 604 F.3d 949, 954 (6th Cir. 2010) (quoting *Watkins v. Evans*, 96 F.3d 1449 (6th Cir. 1996) (table decision)). "In determining whether a prison official had a culpable state of mind, we [] found it helpful to consider 'such factors as the need for the application of force, the relationship between the need and the amount of force that was used, [and] the extent of injury inflicted,' as well as 'the extent of the threat to the safety of staff and inmates.'" *Cordell v. McKinney*, 759 F.3d 573, 581 (6th Cir. 2014) (quoting *Whitley v. Albers*, 475 U.S. 312, 321 (1986) (second alteration in original)).[2] The focus was on "whether the use of force could plausibly have been thought necessary." *Griffin*, 604 F.3d at 954 (quoting *Whitley*, 475 U.S. at 321).

Our pre-*Kingsley* caselaw put Cantea on notice "that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001), *modified on other grounds*

---

[2] *Kingsley* noted that similar factors determine whether an officer's use of force is objectively unreasonable. 135 S. Ct. at 2473 ("Considerations such as the following may bear on the reasonableness or unreasonableness of the force used: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.").

*by Pearson*, 555 U.S. at 236. *Champion*, decided seven years before Kulpa's death, clearly articulated that driving heavy pressure into a prone, handcuffed, incapacitated detainee's back was constitutionally impermissible because it posed a serious risk of asphyxiation to the arrestee and was unnecessary to protect the officers. 380 F.3d at 903–05. Although *Champion* arose in the context of an arrest, the conduct at issue, the risk of death to the detainee, and the minimal threat posed by a bound and incapacitated detainee to officer safety is the same in a pretrial detention center. Furthermore, it was clearly established in 2011 that "pretrial detainees had a clearly established right not to be gratuitously assaulted while fully restrained and subdued." *Coley v. Lucas Cty.*, 799 F.3d 530, 540 (6th Cir. 2015); *Cordell*, 759 F.3d at 587–88.

Cantea argues that—notwithstanding *Champion*'s clear admonition about this precise conduct—the law permitted him to plant significant weight into a prone, handcuffed detainee's back so long as he lacked malicious intent. For the reasons explained above, however, sufficient evidence exists that Cantea acted with malicious intent, given the extent of Kulpa's injury, the minimal threat Kulpa posed to officer safety, and Cantea's application of unnecessary force. In addition, as the Seventh Circuit recently explained, to buy Cantea's argument "we would have to accept the dubious proposition that, at the time the officers acted, they were on notice only that they could not have a reckless or malicious intent and that, as long as they acted without such an intent, they could apply any degree of force they chose." *Kingsley v. Hendrickson*, 801 F.3d 828, 833 (7th Cir. 2015). As we have noted, however, the law clearly established that the "amount of force that was used" must be roughly proportionate to the "need for the application of force." *Cordell*, 759 F.3d at 581 (quoting *Whitley*, 475 U.S. at 321).

### 3.  *Cantea's Other Arguments*

*Evidence of Weight Force.*   Cantea claims that there is no evidence of substantial pressure, pointing out that plaintiff's experts could not quantify the amount of force used.  Yet, Dr. Landers testified that the video showed Cantea applying "great weight . . . [i]t was enough to kill him."  R. 71-5, Landers Dep. 160.   When pressed, Landers conceded that he couldn't quantify the exact poundage that Cantea applied:  "As I've said, I don't have a number. You have a 300-pound man applying force to restrain someone, so it's not just passive weight, it's active pressure from a big, strong man."  *Id.* at 166.  Similarly, Dr. Baden testified that "I can't say if it was 300 pounds of pressure or 600 pounds of pressure.  I could say that it was a great deal of pressure, but certainly can't tell the number of how much pressure there was."  R. 71-7, Baden Dep. 218.

From the experts' inability to testify with exactitude, Cantea posits that "there is no basis to conclude that Cantea applied weight force to Kulpa."  Not so.  A jury could reasonably infer from Cantea's weight, the video showing him over Kulpa's torso, Kulpa's broken ribs and death, that Cantea applied significant pressure to Kulpa's back.  That none of the experts established the exact weight Cantea applied simply underscores the fact-finding needed.

*Evidence of Asphyxiation.*  Cantea next highlights the absence of asphyxiation evidence in the autopsy.  Yet in acknowledging this point, the experts explained that "asphyxial death generally can't be determined from the autopsy alone" but must be found "from the circumstances and the scene and autopsy findings and the history."  R. 71-7, Baden Dep. 74.  Put differently, "the autopsy often does not have evidence of asphyxiation because the asphyxiation [] doesn't cause any abnormalities in the body."  *Id.* at 195, 221 ("[A]sphyxia doesn't have autopsy manifestations."); R. 71-5, Landers Dep. 137 (noting that one would not "expect[] to

have anatomic evidence [of asphyxia] unless something had happened prior, like a myocardial infarction or something else."); R. 76-5, Stark Dep. 87 ("There is no forensic evidence but often there is no forensic evidence with asphyxia.").

And to reiterate, both Dr. Landers and Dr. Baden testified that when Cantea pressed on Kulpa's back, it prevented him from breathing, which precipitated Kulpa's heart failure. R. 71-7, Baden Dep. 195, 203, 297; R. 71-5, Landers Dep. 54, 201. Furthermore, as explained above, the surrounding circumstances support an inference that Kulpa died from asphyxiation. Accordingly, the district court erred in granting Cantea summary judgment on Kulpa's excessive-force claim.

### B.      *Failure to Intervene*

Plaintiff next seeks to hold the officers liable for failing to prevent Cantea from using excessive force. "A police officer may be held liable for failure to intervene during the application of excessive force when: '(1) the officer observed or had reason to know that excessive force would be or was being used; and (2) the officer had both the opportunity and the means to prevent the harm from occurring.'" *Goodwin v. City of Painesville*, 781 F.3d 314, 328 (6th Cir. 2015) (quoting *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997)). We have repeatedly denied qualified immunity when officers observe the use of excessive force yet fail to intercede. *See Ortiz ex rel. Ortiz v. Kazimer*, 811 F.3d 848, 853 (6th Cir. 2016) (denying immunity when the officer "directly observed at least some of the excessive force and had the ability and opportunity to stop it"); *Kent v. Oakland Cty.*, 810 F.3d 384, 397 (6th Cir. 2016); *Goodwin*, 781 F.3d at 328–29.

Here, each officer stood near Cantea—many within arm's reach—as he applied force. Officer Cucchiara knelt next to Kulpa for the entirety of the episode. Officers Gabriel, Rattray,

and Ladas each helped restrain Kulpa while he was on the ground. Officer Peck-Gagne, among the first to enter the cell, removed Kulpa's glasses and watched while Cantea knelt on Kulpa's trunk. Video a7 8:49:20. Officer Martin testified that he saw the other officers restrain Kulpa, including when Kulpa rolled onto his side, R. 58-26, Martin Dep. 21–24; Martin also entered the cell while Cantea pressed his weight into Kulpa's back. Video a7 8:49:47. Officer Horan testified that he operated the handheld video camera, just outside the cell. R. 58-25, Horan Dep. 20. Finally, Officer Abbott testified that he stood outside the cell and observed Cantea and the other officers restrain Kulpa. R. 58-21, Abbott Dep. 29–31. Each officer stood within feet of Cantea, yet none told him to reposition or apply less pressure, or otherwise attempted to intervene.

Accordingly, the district court erred in granting the officers summary judgment on this claim.

### C.  Deliberate Indifference

Plaintiff next argues that the officers were deliberately indifferent to Kulpa's serious medical needs because they observed him unconscious and not breathing, yet failed to summon a nurse or administer emergency aid.

### 1.  Constitutional Violation

"[I]n the context of pretrial detention, the fault requirement for a due process violation may be satisfied by showing that state officials were deliberately indifferent to the basic medical needs of detainees." *Ewolski v. City of Brunswick*, 287 F.3d 492, 510 (6th Cir. 2002) (citing *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 850 (1998)). "Deliberate indifference requires that the defendants knew of and disregarded a substantial risk of serious harm to the pretrial detainee's health and safety." *Estate of Owensby v. City of Cincinnati*, 414 F.3d 596, 603 (6th Cir. 2005)

(quoting *Watkins v. City of Battle Creek*, 273 F.3d 682, 686 (6th Cir. 2001) (alterations omitted)).

In *Owensby*, officers allegedly beat and maced a handcuffed suspect before throwing him into the back of a police cruiser. *Id.* at 599–600. Though several officers noted that it looked like the suspect couldn't breathe, no officer provided medical aid until six minutes later. *Id.* at 601. At that point, emergency medical technicians intervened, but their CPR attempts failed to revive the suspect. *Id.* We held that the officers exhibited deliberate indifference to the man's serious medical needs. We first noted "little difficulty finding a substantial risk of serious harm to Owensby's health and safety, as evidenced by his death." *Id.* at 603. And we reasoned that a jury could infer callous indifference, given "that each officer viewed [the decedent] in significant physical distress, yet made no attempt to summon or provide any medical care until several minutes later." *Id.*; *see also Jones v. City of Cincinnati*, 521 F.3d 555, 560 (6th Cir. 2008). Accordingly, at the time of Kulpa's death, the law clearly established that officers must provide prompt aid to an unbreathing detainee.

Here, a jury could reasonably find that each officer disregarded Kulpa's serious medical needs. Cardiac arrest certainly poses a substantial risk of serious harm, warranting immediate medical aid. Furthermore, Dr. Landers testified that CPR has a very narrow window to succeed—the longer that CPR is delayed, the less likely that the individual will recover. R. 71-5, Landers Dep. 1245–46.

In addition, a jury could infer that each officer, standing in or just outside the cell, knew that Kulpa needed immediate attention.[3] The video shows Kulpa unconscious—his body appears

---

[3] The Appellees' brief suggests that neither Gabriel nor Peck-Gagne observed Kulpa in the restraining chair. But both officers testified otherwise. R. 58-22, Gabriel Dep. 19 ("Yes, I saw him in the chair."); R. 58-24, Peck-Gagne Dep. 30 ("Yes, I saw them lift him and put him in

completely limp—as Cantea and Cucchiara picked him off the ground. Video a7 8:50:27–30; Handheld Video 1:15. In succeeding frames, the video again shows Cantea pulling Kulpa's left forearm and twisting it unnaturally behind Kulpa's body, without Kulpa reacting in pain. *Id.* Once seated in the chair, Kulpa's head appears tilted back, his eyes shut, his jaw slack. And as the officers rolled him into the cell, his limp body sagged to the left. Handheld Video 1:15–23. A jury could infer from Kulpa's obvious unconsciousness that the officers knew he needed prompt medical attention. A jury could thus conclude that the officers were deliberately indifferent to Kulpa's serious medical needs.

### 2.      *The Officers' Counterargument*

The officers retort that Peck-Gagne contacted the medical staff and told them "to come right away." R. 58-29, Progress Note, PID 751. According to the officers, "[w]ith Peck-Gagne having already contacted the medical staff, it is absurd for the Plaintiff-Appellant to suggest that all of the other officers should have done so as well."

Peck-Gagne testified that she left the cell while the other officers restrained Kulpa on the ground. She called medical and told a nurse "that we needed her down here to check Kulpa because I noticed there was a little bit of – there was a spot of blood on the floor of the detox cell and I said I thought he could perhaps be bleeding from his nose, I didn't know exactly what it was, but if somebody could come down and check him." R. 58-24, Peck-Gagne Dep. 18. She also called because "every time we place somebody in the chair, it's protocol that we have to have the nurse check them." *Id.* at 22.

---

the chair."). The Appellees also assert that Plaintiff failed to engage in an individualized assessment of each deputy's actions. But because each deputy admitted to observing Kulpa in the chair, yet failed to offer aid, any additional individualized analysis would be redundant.

Peck-Gagne's testimony shows that she walked from the room where the struggle took place to the nearby medical office to report a possible bloody nose and request a routine check of an inmate placed in the restraining chair. This testimony fails to counter the officers' indifference to Kulpa's noticeably unconscious state. Only after crucial minutes had elapsed did Peck-Gagne call for emergency assistance. The officers' attempt to equate a bloody nose (where a few-minute treatment delay makes no difference) and cardiac arrest (where every second without CPR increases the likelihood of death) is unavailing.

Accordingly, the district court erred in granting the officers summary judgment on this claim.

**III.**

Plaintiff also claims that Macomb County failed to adequately train its officers. "To be actionable, a municipality's training must be inadequate to the tasks that its officers must perform, this inadequacy must be the product of deliberate indifference, and this inadequacy must have been closely related to or have actually caused the plaintiff's injury." *Cherrington v. Skeeter*, 344 F.3d 631, 646 (6th Cir. 2003). Failure-to-train cases typically fall into two categories. In the first, a municipality fails "to provide adequate training in light of foreseeable consequences that could result from the lack of instruction." *Brown v. Shaner*, 172 F.3d 927, 931 (6th Cir. 1999). In the second, "the city fails to act in response to repeated complaints of constitutional violations by its officers." *Id.*

In support of her claim, plaintiff offers only a use-of-force expert, Ken Katsaris, who opined that the unconstitutional training deficiency was the county's failure to train its officers to first place the inmate in the restraining chair before removing handcuffs, to avoid positioning a detainee on his stomach. R. 71-6, Katsaris Aff. ¶ 6. But no case suggests that the Constitution

requires officers to first place a handcuffed detainee in a restraining chair before removing handcuffs. Indeed, one of plaintiff's other use-of-force experts, Michael Hackett, testified that there are safe, widely practiced ways to remove handcuffs from a prone detainee. R. 76-3, Hackett Dep. 130–31. Finally, plaintiff offers no evidence of repeated complaints regarding similar constitutional violations. Accordingly, we affirm the district court's dismissal of the municipal-liability claim.

## IV.

For these reasons we AFFIRM the district court's dismissal of the municipal-liability claim, but REVERSE the district court's grant of summary judgment in favor of the officers with respect to the excessive-force, failure-to-intervene, and deliberate-indifference claims.