RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 24a0086p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

KAMEL CHANEY-SNELL,

　　　　　　　*Plaintiff-Appellee*,

　　*v.*

ANDREW YOUNG (22-1992); ANDREW TEICHOW (22-1990),

　　　　　　　*Defendants-Appellants*.

┐
│
│
│
│  Nos. 22-1990/1992
│
│
│
┘

─────────────────

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:20-cv-13064—Nancy G. Edmunds, District Judge.

Argued:  October 25, 2023

Decided and Filed:  April 15, 2024

Before:  WHITE, NALBANDIAN, and MURPHY, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:**  Todd J. Shoudy, FLETCHER FEALKO SHOUDY & FRANCIS, PC, Port Huron, Michigan, for Appellant Young.  Kevin J. Campbell, CUMMINGS, MCCLOREY, DAVIS & ACHO, PLC, Livonia, Michigan, for Appellant Teichow.  Shawn C. Cabot, CHRISTOPHER TRAINOR & ASSOCIATES, White Lake, Michigan, for Appellee.  **ON BRIEF:**  Todd J. Shoudy, FLETCHER FEALKO SHOUDY & FRANCIS, PC, Port Huron, Michigan, for Appellant Young.  Kevin J. Campbell, CUMMINGS, MCCLOREY, DAVIS & ACHO, PLC, Livonia, Michigan, for Appellant Teichow.  Shawn C. Cabot, CHRISTOPHER TRAINOR & ASSOCIATES, White Lake, Michigan, for Appellee.

———————————

**OPINION**

———————————

MURPHY, Circuit Judge.  Deputy Andrew Young and Officer Andrew Teichow arrested Kamel Chaney-Snell during a search of his girlfriend's house.  Chaney-Snell pleaded guilty to attempting to resist their arrest.  But he now claims that, after he peacefully surrendered, Young punched him in the face and one of the officers kneed him in the back and dragged him across the floor.  Chaney-Snell sued Young and Teichow under 42 U.S.C. § 1983, alleging excessive-force and failure-to-intervene claims.  The district court denied qualified immunity to both officers.

Their appeals raise three questions.  Question One: Must we accept Chaney-Snell's claim that Young gratuitously punched him despite Chaney-Snell's guilty plea for attempting to resist arrest?  Young answers "no" on the ground that Chaney-Snell's claim conflicts with his conviction.  *See Heck v. Humphrey*, 512 U.S. 477, 486–87 (1994).  At the least, Young argues, judicial estoppel bars Chaney-Snell's claim because it also conflicts with his admissions at his plea hearing.  But we lack jurisdiction over Young's *Heck* claim, and his judicial-estoppel claim fails on the merits.

Question Two: Does the Fourth Amendment allow officers to use unnecessary force on arrestees if the force qualifies as "de minimis"?  Young and Teichow concede that, under Chaney-Snell's allegations, one of them gratuitously kneed him in the back and dragged him on the floor.  They nevertheless argue that this force falls below the minimum level required for an excessive-force claim.  But our cases have long held that gratuitous force violates the Fourth Amendment even if the force is minor and causes no serious injury.  And these cases comport with the common-law backdrop against which the Fourth and Fourteenth Amendments were enacted.

Question Three: Has Chaney-Snell established a "failure to intervene" theory of liability?  Chaney-Snell seeks to hold the officer who did not employ the challenged force liable for failing to prevent it.  Even under his allegations, however, this officer did not have a realistic

opportunity to stop each of the quick and discrete actions. And while the district court decided to treat all of the actions as a single continuous use of force, our caselaw does not clearly establish that decision. Qualified immunity thus protects the officers from Chaney-Snell's failure-to-intervene claims.

All told, we affirm in part, reverse in part, and dismiss in part for lack of jurisdiction.

I

A

Chaney-Snell often stayed at his girlfriend's home in Port Huron, Michigan. In 2018, he began selling drugs from this home without his girlfriend's permission. These drug deals drew the attention of a drug task force operating in St. Clair County. A confidential informant working with the task force bought drugs from Chaney-Snell at his girlfriend's home in early 2019. That February, a task-force officer obtained a warrant to search her house.

The task force executed the warrant on the evening of February 6. Deputy Young and Officer Teichow, two task-force members, participated in this search. The Port Huron Police Department had assigned Teichow to the task force, and the St. Clair County Sheriff's Department had assigned Young.

At the time of the search, Chaney-Snell was at his girlfriend's home alone because she had gone to work. The parties tell drastically different stories of how Young and Teichow arrested Chaney-Snell while securing this home.

We begin with the officers' account. According to Young and Teichow, an officer knocked on the front door and announced their presence. Nobody answered. So another officer rammed open the door. Young entered first, followed by Teichow. They encountered a second locked door because the homeowner had split the home into two units. Young kicked in the door. Officers then flooded the house shouting "sheriff's department, search warrant, get on the ground." Young Dep., R.30-7, PageID 726.

As Young and Teichow made it to the dining area, they spotted Chaney-Snell in the living room. The officers screamed for him to "get on the ground," but he fled to a bedroom.

Teichow Dep., R.30-6, PageID 697; Young Dep., R.30-7, PageID 727. The officers pursued him.

When they entered the bedroom, they saw Chaney-Snell concealing himself in a closet. Chaney-Snell had his back to the officers, so they told him to show his hands. He did not comply. Young ran toward the closet while holstering his firearm. He pushed Chaney-Snell into the wall and onto the ground to handcuff him. When using this force, Young placed one hand on Chaney-Snell's back and the other on his face. Chaney-Snell hit the ground on the left side of his face and stomach. Young fell on top of him. But Chaney-Snell continued to struggle. Young struck Chaney-Snell with his knee a few times to get Chaney-Snell to place his arms behind his back. The officers then handcuffed him. Young patted Chaney-Snell down, and the officers walked him to a bed to sit on.

Chaney-Snell recalls things differently. He did not hear the officers announce their presence because he was in a bedroom listening to "loud" music on his headphones. Chaney-Snell Dep., R.30-4, PageID 568. But Chaney-Snell thought he heard a "bang" when Young kicked open the second door. *Id.* The noise led Chaney-Snell to take off his headphones and stand up.

At that time, two officers ran into the bedroom and shouted "show me your hands." *Id.*, PageID 572. Chaney-Snell immediately raised his hands. Yet he says that an officer punched him in the left eye without warning. So Chaney-Snell covered his face and failed to comply with additional requests to raise his hands. But he eventually put them up again. The same officer then sucker punched him a second time in the same spot. Chaney-Snell fell to the ground. He recalls putting up no resistance as the officers handcuffed him. Right after they restrained him, Chaney-Snell could feel an officer kneeing him in the back using his full weight. An officer next dragged him across the bedroom floor by his ankles. The officers picked Chaney-Snell up, strip-searched him, and put him on the bed.

Once Chaney-Snell made it to the bed, the parties' stories reconverge. The officers acknowledged that Chaney-Snell had an injury on his left eye and a rug burn on his right shoulder. Teichow added that Chaney-Snell said that "he was having a hard time breathing" and

asked for his asthma inhaler.  Teichow Dep., R.30-6, PageID 702.  Another officer gave Chaney-Snell "three puffs" from this inhaler.  Chaney-Snell Dep., R.30-4, PageID 576.  Paramedics checked on him, and an officer drove him to jail.  A jail nurse sent Chaney-Snell to the hospital.

The hospital took several CT scans.  Scans of Chaney-Snell's back and head showed no injuries, but an eye scan revealed what a doctor diagnosed as a "minimal nondisplaced blowout fracture" to his left orbital bones.  Records, R.35-7, PageID 1032.  The doctor recommended that Chaney-Snell take Tylenol for any pain and discharged him.

B

Chaney-Snell's encounter with Young and Teichow produced both criminal and civil proceedings.  The State of Michigan criminally charged Chaney-Snell with possessing cocaine and resisting the officers.  Chaney-Snell entered a plea agreement.  As part of the deal, he agreed to plead guilty to the drug count and to *attempting* to resist the officers.  At his plea hearing, he conceded that Young and Teichow had given him "verbal commands to show them [his] hands" and that he had "failed to comply" with their "lawful" orders.  Plea Tr., R.30-8, PageID 764–65. The state court accepted his plea.  It sentenced him to six months' imprisonment.

With his criminal proceedings behind him, Chaney-Snell pursued this civil case under 42 U.S.C. § 1983.  He sued Deputy Young and his employer (St. Clair County), as well as Officer Teichow and his employer (the City of Port Huron).  Chaney-Snell could not identify which officer did what.  But he alleged that one officer used excessive force and that the other failed to intervene to stop this force, both in violation of the Fourth Amendment.  He also asserted claims against St. Clair County and the City of Port Huron under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

All defendants moved for summary judgment.  Discovery identified Young as the only officer who could have punched Chaney-Snell.  But Young asked the district court to reject this allegation.  He argued that the "*Heck* doctrine" barred the claim because it contradicted Chaney-Snell's conviction.  *See Heck*, 512 U.S. at 486–87.  He also argued that judicial estoppel barred the claim because it conflicted with Chaney-Snell's admissions in open court.  The district court disagreed.  *See Chaney-Snell v. Young*, 2022 WL 4667942, at *3–4 (E.D. Mich. Sept. 30, 2022).

The district court also rejected Young's and Teichow's requests for qualified immunity. It held that Young would have violated clearly established law if he had punched a non-resisting Chaney-Snell. *Id.* at *5. It next turned to Chaney-Snell's claim that, after he was restrained, an officer kneed him in the back and dragged him across the floor. *Id.* If true, the court held, this conduct also violated clearly established law. *Id.* The court separately held that the officer who did not use the force could face liability on a "failure to intervene theory." *Id.* But it granted summary judgment to the county and city on Chaney-Snell's *Monell* claims. *Id.* at *6.

II

Deputy Young and Officer Teichow appealed. Their appeals require us to consider the three questions that we highlighted at the outset. We will address them in the same order.

A.     *Question One: Must we accept Chaney-Snell's testimony that Young gratuitously punched him despite Chaney-Snell's conviction for attempting to resist arrest?*

While disputing Chaney-Snell's factual allegations, Deputy Young recognizes that we generally must accept them at this stage. To his credit, Young also concedes that he would have violated clearly established law under Chaney-Snell's facts. Still, Young argues that Chaney-Snell's conviction for attempting to resist arrest allows us to reject his claim that Young punched him in the face. To support this theory, Young relies on the "*Heck* doctrine" and judicial estoppel. But our interlocutory jurisdiction does not extend to his *Heck* claim. And his estoppel claim fails because Chaney-Snell has adequately reconciled his statements across the two cases.

1. The *Heck* Doctrine

The *Heck* doctrine addresses a common situation: Criminal defendants often get convicted of a crime and then seek damages under § 1983 on the ground that public officials violated the Constitution while investigating or prosecuting the crime. What happens if a defendant's damages suit under § 1983 would, if successful, "necessarily imply the invalidity of his conviction"? *Nance v. Ward*, 597 U.S. 159, 167 (2022) (quoting *Heck*, 512 U.S. at 487). In that event, *Heck* held, a criminal defendant must overturn the conviction on direct appeal or in habeas before seeking civil damages under § 1983. 512 U.S. at 486–87. The Court also offered an example of when this "*Heck* bar" would apply: A defendant found guilty of resisting "a *lawful*

arrest" could not claim in a § 1983 suit that an officer's excessive force had rendered the arrest *unlawful* unless a court vacated the resisting-arrest conviction. *Id.* at 486 n.6.

We have since turned *Heck*'s example into a holding. *See Hayward v. Cleveland Clinic Found.*, 759 F.3d 601, 608–13 (6th Cir. 2014). In *Hayward*, a defendant pleaded guilty to violating an Ohio resisting-arrest law. *Id.* at 606. He then brought an excessive-force claim under § 1983. *Id.* We held that *Heck* barred this claim because the Ohio law allowed defendants to avoid guilt if officers used excessive force when effecting their arrests. *Id.* at 611–12. So a claim that officers used excessive force during an arrest implied the invalidity of the resisting-arrest conviction. *Id.*

In *Schreiber v. Moe*, 596 F.3d 323 (6th Cir. 2010), though, we refused to apply this logic to the Michigan offense that Chaney-Snell pleaded guilty to. *See id.* at 334–35; Mich. Comp. Laws § 750.81d(1). Why? The then-existing Michigan caselaw interpreted this law *not* to require proof that an officer had made a lawful arrest. *See Schreiber*, 596 F.3d at 334–35 (citing *People v. Ventura*, 686 N.W.2d 748, 752 (Mich. Ct. App. 2004)). The law thus did not allow defendants to avoid liability if officers used excessive force during the arrest. So a finding that an officer used such force in a § 1983 suit would not conflict with an earlier resisting-arrest conviction. *Id.*

But Michigan caselaw has since changed. In 2012, the Michigan Supreme Court overruled the state decision (*Ventura*) on which *Schreiber* relied for its conclusion. *See People v. Moreno*, 814 N.W.2d 624, 625 (Mich. 2012). *Moreno* held that the resisting-arrest statute required prosecutors to prove that the police had made a lawful arrest. *See id.* at 626–34. Given *Moreno*, Young argues, the claim that he used excessive force to arrest Chaney-Snell implies the invalidity of Chaney-Snell's conviction. And while we have favorably cited *Schreiber* in two unpublished opinions after *Moreno*, neither identified *Moreno*'s change in law or discussed how it affects our *Heck* analysis. *See Sevenski v. Artfitch*, 2022 WL 2826818, at *5 n.4 (6th Cir. July 20, 2022); *Ruemenapp v. Oscoda Township*, 739 F. App'x 804, 809–10 (6th Cir. 2018).

Young raises an important question about the scope of *Heck* that warrants a reasoned answer at the proper time. But we can provide that answer only in an appeal where we have

jurisdiction to consider the issue. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93–102 (1998). And we lack jurisdiction to address the argument now.

Start with the jurisdictional basics. With a few exceptions, Congress has granted circuit courts jurisdiction to review only "final decisions of the district courts[.]" 28 U.S.C. § 1291. The phrase "final decisions" generally covers only those orders that end the litigation. *See Hall v. Hall*, 584 U.S. 59, 64 (2018). Young does not argue that the district court's order denying summary judgment meets this usual definition. To the contrary, the court set the case for trial.

Under the collateral-order doctrine, however, the Supreme Court treats some decisions that do not end the litigation as sufficiently "final" for purposes of § 1291. *See DeCrane v. Eckart*, 12 F.4th 586, 601 (6th Cir. 2021). To qualify as a "final" decision under this doctrine, an order must resolve a concrete issue, that issue must be distinct from the merits of the plaintiff's claims, and the issue must be "effectively unreviewable" if an appellate court waits to hear the issue until the case's completion. *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 106 (2009) (quoting *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 42 (1995)). An order denying qualified immunity exemplifies the type of decision that meets this test. *See Mitchell v. Forsyth*, 472 U.S. 511, 524–30 (1985). An officer's qualified-immunity defense is distinct from the merits of the plaintiff's claims. *See id.* at 527–28. And qualified immunity represents not just a defense against a damages award but also an "*immunity from suit*[.]" *Id.* at 526. So officers would lose their right to qualified immunity if they had to stand trial before they could appeal its denial. *Id.* at 525–27.

The denial of Young's *Heck* challenge, by comparison, does not satisfy this collateral-order test. The Supreme Court did not adopt *Heck*'s "implicit exception" to § 1983's cause of action to grant any type of immunity from suit. *Nance*, 597 U.S. at 167 (citation omitted). Rather, the Court adopted the *Heck* bar to resolve a choice-of-law problem. The bar ensures that § 1983's broad cause of action does not swallow up the habeas laws by covering claims that prisoners traditionally litigated in habeas. *See id.* And those sued under § 1983 can vindicate this interest after a final judgment. *See Sayed v. Virginia*, 744 F. App'x 542, 547–48 (10th Cir. 2018). As many courts have recognized, the denial of a *Heck* claim is not "effectively unreviewable" at a suit's end. *Mitchell*, 472 U.S. at 527; *see Harrigan v. Metro Dade Police*

*Dep't Station No. 4*, 636 F. App'x 470, 475–76 (11th Cir. 2015) (per curiam); *Southall v. Arias*, 256 F. App'x 674, 675–76 (5th Cir. 2007); *Cunningham v. Gates*, 229 F.3d 1271, 1284 (9th Cir. 2000).

Even Young does not assert that he could have appealed the denial of his *Heck* claim *by itself*. Rather, he says that we may exercise what we have dubbed "pendent appellate jurisdiction" over this claim. *See Stojcevski v. Macomb County*, 827 F. App'x 515, 523 (6th Cir. 2020). That jurisdiction allows an appellate court to review an otherwise unappealable issue if it has an adequate connection to an appealable one. *See Chambers v. Ohio Dep't of Hum. Servs.*, 145 F.3d 793, 797 (6th Cir. 1998). In *Swint*, the Supreme Court suggested in dicta that this interlocutory jurisdiction might cover an unappealable issue if it is "inextricably intertwined" with an appealable issue or if a court needs to review the unappealable issue to give "meaningful review" to the appealable one. 514 U.S. at 51.

Since *Swint*, we have adopted both standards. For one thing, we have jurisdiction over an unappealable issue that is "inextricably intertwined" with an appealable issue. *See Mattox v. City of Forest Park*, 183 F.3d 515, 523–24 (6th Cir. 1999). To be sufficiently "intertwined," the unappealable issue must be "coterminous with, or subsumed in," the appealable issue. *Williams v. Maurer*, 9 F.4th 416, 429 (6th Cir. 2021) (quoting *Farm Lab. Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 549 (6th Cir. 2002)). Put another way, our resolution of the appealable issue must resolve the unappealable issue too. *See id.*; *Mattox*, 183 F.3d at 523–24; *Brennan v. Township of Northville*, 78 F.3d 1152, 1157–58 (6th Cir. 1996). If the issues do not rise or fall together, they are not adequately intertwined. *See Stojcevski*, 827 F. App'x at 524; *Hopper v. Plummer*, 887 F.3d 744, 760–61 (6th Cir. 2018); *Bays v. Montmorency County*, 874 F.3d 264, 270 (6th Cir. 2017).

For another thing, we have jurisdiction over an unappealable issue that we must address to allow for "meaningful review" of an appealable issue. *Lowe v. Hamilton Cnty. Dep't of Job & Fam. Servs.*, 610 F.3d 321, 324 (6th Cir. 2010) (quoting *Swint*, 514 U.S. at 51). When reviewing an appealable injunction order, for example, we considered an earlier unappealable decision that the order incorporated as part of its rationale for granting the injunction. *Chambers*, 145 F.3d at 797. In another case, by contrast, we refused to consider an unappealable abstention issue when

that issue would not affect the merits of the appealable qualified-immunity order that we were reviewing. *Summers v. Leis*, 368 F.3d 881, 889–90 (6th Cir. 2004).

Does an unappealable *Heck* claim meet either test for pendent appellate jurisdiction when an officer raises the claim in an appeal of the denial of qualified immunity? We have said both "yes" and "no" to this question. A pair of unpublished cases have found *Heck* claims "inextricably intertwined" with qualified-immunity appeals. *See Lucier v. City of Ecorse*, 601 F. App'x 372, 376 (6th Cir. 2015); *McAdam v. Warmuskerken*, 517 F. App'x 437, 438 (6th Cir. 2013) (per curiam). But these cases did not offer any "detail" to support their conclusion. *Dennis v. City of Philadelphia*, 19 F.4th 279, 286 n.22 (3d Cir. 2021). And another pair of unpublished cases have held that we lack jurisdiction over *Heck* claims in this setting. *See Flanigan v. Panin*, 724 F. App'x 375, 377 (6th Cir. 2018); *Norton v. Stille*, 526 F. App'x 509, 515 (6th Cir. 2013).

Siding with the second pair of cases, we now hold that we lack pendent appellate jurisdiction over *Heck* claims in qualified-immunity appeals. To begin with, those claims do not satisfy our "inextricably intertwined" test. To meet that test, our resolution of the qualified-immunity issue must "*necessarily* resolve[]" the *Heck* issue. *Hopper*, 887 F.3d at 760–61 (quoting *Mattox*, 183 F.3d at 524). But the conclusion that Young could not rely on qualified immunity if he had gratuitously punched Chaney-Snell says nothing about the merits of Young's *Heck* claim. The qualified-immunity issue asks a question about the Fourth Amendment: Did our cases clearly establish that Young's (allegedly) gratuitous force violated that amendment? *See Gambrel v. Knox County*, 25 F.4th 391, 400, 403 (6th Cir. 2022). The *Heck* issue asks a question about Michigan law: Does Chanel-Snell's claim that Young punched him "imply the invalidity of his conviction" under the resisting-arrest statute? 512 U.S. at 487. These two inquiries are not "intertwined" at all—let alone inextricably so. *See Norton*, 526 F. App'x at 515.

For the same reasons, we can give "meaningful review" to the district court's denial of qualified immunity without addressing its *Heck* ruling. *Swint*, 514 U.S. at 51. Unlike an appealable decision that relies on an earlier unappealable order, *see Chambers*, 145 F.3d at 797, the district court's qualified-immunity denial did not adopt any part of its *Heck* reasoning.

That fact should not come as a surprise because the *Heck* inquiry and the qualified-immunity inquiry follow "separate and distinct legal standards." *Summers*, 368 F.3d at 889–90.

The great weight of authority confirms our conclusion. Many courts hold that they lack jurisdiction over *Heck* claims in qualified-immunity appeals. *See Montoya v. City and County of Denver*, 2022 WL 1837828, at *9–10 (10th Cir. June 3, 2022); *Dennis*, 19 F.4th at 285–87; *Harrigan*, 636 F. App'x at 476; *Limone v. Condon*, 372 F.3d 39, 50–52 (1st Cir. 2004); *Cunningham*, 229 F.3d at 1285. And while the Fifth Circuit sees things differently, it has opinions on both sides of the issue. *See Poole v. City of Shreveport*, 13 F.4th 420, 426 (5th Cir. 2021).

In response, Young says that we cannot "meaningful[ly] review" his qualified-immunity request without addressing his *Heck* argument. *Swint*, 514 U.S. at 51. If we agree with that argument, Young reasons, we must accept his version of the facts to decide the qualified-immunity issue. This logic misunderstands *Heck*. *Heck* does not exist to identify the facts that are in "genuine dispute" at the summary-judgment stage. Fed. R. Civ. P. 56(a). It exists to determine whether (and when) a § 1983 plaintiff has "a complete and present cause of action[.]" *McDonough v. Smith*, 139 S. Ct. 2149, 2158 (2019) (citation omitted). If the plaintiff's version of the facts implies the invalidity of the prior conviction, *Heck* means that the § 1983 claim is not "cognizable" until the defendant overturns the conviction. 512 U.S. at 483. So a court should *dismiss* the § 1983 claim—not *continue to litigate* it under the officer's version of the facts. *See id.* at 487.

Indeed, a *Heck* ruling for Young would conflict with the qualified-immunity ruling he seeks. When *Heck* bars a § 1983 claim against an officer, the court should dismiss the claim *without prejudice* so that the § 1983 plaintiff may refile the suit if a court later invalidates the prior conviction. *See Johnson v. Rogers*, 944 F.3d 966, 968 (7th Cir. 2019); *Wheeler v. Dayton Police Dep't*, 807 F.3d 764, 767 (6th Cir. 2015); *Amaker v. Weiner*, 179 F.3d 48, 52 (2d Cir. 1999). When qualified immunity bars a § 1983 claim, the court should dismiss the claim *with prejudice* to any later refiling. *See Johnson*, 944 F.3d at 968. Young's efforts to smuggle the *Heck* inquiry into the qualified-immunity analysis muddies this difference. Should the district court dismiss the claim without prejudice because it relied on *Heck* to determine the facts? Or

should the court dismiss the claim with prejudice because it granted qualified immunity?  By keeping these "distinct" doctrines distinct, a court keeps the nature of its judgment clear.  *See Dennis*, 19 F.4th at 286.

We end with a point that Deputy Young did not raise.  The best counterargument to our holding might arise from an analogy to the implied cause of action that plaintiffs can pursue against *federal* officers under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).  The Supreme Court has held that when an appellate court considers a federal officer's qualified-immunity appeal, it has jurisdiction to decide whether a plaintiff can even assert a *Bivens* "cause of action" to vindicate the constitutional right at issue.  *Wilkie v. Robbins*, 551 U.S. 537, 549 n.4 (2007); *Elhady v. Unidentified CBP Agents*, 18 F.4th 880, 884 (6th Cir. 2021).  One could argue that a court should treat the *Heck* question like this *Bivens* question because *Heck* also concerns whether the plaintiff has a "cognizable" claim.  512 U.S. at 483.  That said, *Heck* creates only a precondition to a § 1983 suit (invalidation of the prior conviction)—not an absolute bar to the suit.  So one could alternatively argue that the *Heck* bar looks like other preconditions (such as exhaustion) that we have held do not fall within our pendent appellate jurisdiction.  *See Lowe*, 610 F.3d at 323–24; 15A Charles Alan Wright et al., *Federal Practice and Procedure* § 3914.10.7, at 817–19 (3d ed. 2022).  In fact, the uncertainty over whether a plaintiff must prove the inapplicability of *Heck* or whether the defendant must raise the *Heck* bar as a defense has created a circuit split in other contexts.  *See Garrett v. Murphy*, 17 F.4th 419, 427 (3d Cir. 2021).  Be that as it may, we need not conclusively identify the nature of the *Heck* bar to resolve this appeal.  Whatever *Heck*'s nature, we hold only that we lack pendent appellate jurisdiction over Young's *Heck* claim under our traditional standards for deciding whether that jurisdiction exists.

### 2.  Judicial Estoppel

Deputy Young next relies on judicial estoppel to bar Chaney-Snell's claim that Young punched him after he surrendered.  Judicial estoppel bars litigants from "playing fast and loose with the courts" by asserting one position in one case and the opposite position in a later case.  *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (citation omitted); *Mirando v. U.S. Dep't of*

*Treasury*, 766 F.3d 540, 545 (6th Cir. 2014). This doctrine applies, Young asserts, because Chaney-Snell's admissions in his criminal case conflict with his statements in this civil suit.

Does Young's judicial-estoppel argument have the same jurisdictional flaw as his *Heck* claim? No, this argument contains a critical difference. Unlike his *Heck* claim, Young's estoppel argument could alter the "historic facts" that we would consider when deciding his qualified-immunity request. *Thore v. Howe*, 466 F.3d 173, 178–87 (1st Cir. 2006). If Chaney-Snell admitted in the criminal case that Young did not punch him, judicial estoppel might bar Chaney-Snell from claiming the contrary in this suit. *See Lowery v. Stovall*, 92 F.3d 219, 222–25 (4th Cir. 1996). If so, we would ask whether Young should receive qualified immunity under *his* version of the events, *see id.* at 221, 226, the only "genuine" version given our estoppel holding, Fed. R. Civ. P. 56(a). Because Young's qualified-immunity claim "cannot be resolved without addressing" his estoppel argument, *Chambers*, 145 F.3d at 797, we may consider that argument to "meaningful[ly] review" the immunity claim, *Swint*, 514 U.S. at 51; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 673–75 (2009).

An analogy to issue preclusion confirms this point. Under that doctrine, we often hold that a § 1983 plaintiff who pleaded guilty in a state criminal case cannot relitigate an issue (for example, whether probable cause existed) that the state court decided. *See Spencer v. County of Huron*, 717 F. App'x 555, 557–59 (6th Cir. 2017); *Bach v. Drerup*, 545 F. App'x 474, 477 (6th Cir. 2013); *see also Godboldo v. County of Wayne*, 686 F. App'x 335, 340–43 (6th Cir. 2017). Notably, when a district court rejects an officer's issue-preclusion argument in a later § 1983 suit, the officer may raise the argument in a qualified-immunity appeal. *See Peterson v. Heymes*, 931 F.3d 546, 553 (6th Cir. 2019); *Godboldo*, 686 F. App'x at 338, 340; *Roberson v. Torres*, 770 F.3d 398, 401–03 (6th Cir. 2014); *Evans v. Bd. of Educ. Sw. City Sch. Dist.*, 425 F. App'x 432, 437 (6th Cir. 2011). *But cf. Siggers v. Alex*, 2023 WL 5986603, at *3 & n.5 (6th Cir. Sept. 12, 2023). The same logic covers Young's judicial-estoppel argument.

Nevertheless, Young's judicial-estoppel claim fails on the merits. Our cases ask three questions when deciding whether a court should judicially estop a party. *See Mirando*, 766 F.3d at 545. First, has the party taken a position in the current case that is "clearly inconsistent" with a position the party took in an earlier case? *Id.* (quoting *New Hampshire*, 532 U.S. at 750).

Second, did the earlier position prevail in the prior case and so create a perception that the prior court or the current court has been misled? *See id.* And third, would this flip-flopping give the party an "unfair advantage" or impose an "unfair detriment" on the other side? *Id.* (quoting *New Hampshire*, 532 U.S. at 751). Although courts have discretion when deciding whether to invoke judicial estoppel, *New Hampshire*, 532 U.S. at 750, our recent cases typically require a court to answer all three questions in the affirmative before estopping a party from taking the position in the second case. *Compare Shufeldt v. Baker, Donelson, Bearman, Caldwell & Berkowitz, PC*, 855 F. App'x 239, 243–47 (6th Cir. 2021), *and In re Berge*, 953 F.3d 907, 922 (6th Cir. 2020), *with Han v. Hankook Tire Co.*, 799 F. App'x 347, 349–50 (6th Cir. 2020), *and Mirando*, 766 F.3d at 546–48.

Courts sometimes must apply these estoppel standards to the specific question whether a § 1983 plaintiff may assert a factual allegation that contradicts the plaintiff's statements made when pleading guilty in an earlier criminal case. *See Grise v. Allen*, 714 F. App'x 489, 495–96 (6th Cir. 2017); *Wells v. Coker*, 707 F.3d 756, 760–62 (7th Cir. 2013); *Wolfe v. Footen*, 418 F. App'x 256, 259–60 (4th Cir. 2011); *Sulfridge v. Huff*, 313 F. App'x 820, 825 (6th Cir. 2009); *Bradford v. Wiggins*, 516 F.3d 1189, 1194–95 (10th Cir. 2008) (per curiam); *Thore*, 466 F.3d at 182–87; *Johnson v. Lindon City Corp.*, 405 F.3d 1065, 1068, 1068–70 (10th Cir. 2005); *Lowery*, 92 F.3d at 224–25. To identify the facts that the plaintiff admitted in the criminal case, these courts have examined such records as the transcript of the "plea hearing," *Lowery*, 92 F.3d at 224, or "the language of the plea agreement," *United States v. Hammon*, 277 F. App'x 560, 566 (6th Cir. 2008).

In this case, our analysis can begin (and end) with the first factor, which requires a party to have taken "clearly inconsistent" positions. *New Hampshire*, 532 U.S. at 750 (citation omitted). For shifting claims to satisfy this factor, a party must have made two impossible-to-reconcile statements. Judicial estoppel does not apply if the party can explain why its current position comports with a (perhaps ambiguous) prior position. *See Butler v. United Healthcare of Tenn., Inc.*, 764 F.3d 563, 570 (6th Cir. 2014); *Lorillard Tobacco Co. v. Chester, Willcox & Saxbe, LLP*, 546 F.3d 752, 758 (6th Cir. 2008); *Griffith v. Wal-Mart Stores, Inc.*, 135 F.3d 376, 382 (6th Cir. 1998).

Young cannot satisfy this test because Chaney-Snell's testimony in this § 1983 case does not plainly contradict the perfunctory admissions he made when pleading guilty. *See New Hampshire*, 532 U.S. at 750. Start with his criminal case. During his plea colloquy, Chaney-Snell pleaded guilty to "attempted resisting and obstructing a police officer[.]" Plea Tr., R.30-8, PageID 760, 763. He then admitted "what [he] did that [made him] guilty" of this crime. *Id.*, PageID 764. Chaney-Snell conceded that "at some point" after Young and Teichow entered his girlfriend's house, he was "given some verbal commands to show them [his] hands[.]" *Id.*, PageID 765. And he conceded that he "failed to comply with . . . the lawful command of" one of the officers. *Id.*

Now turn to this § 1983 case. During his deposition, Chaney-Snell admitted that he heard the officers shout "show me your hands" when they confronted him. Chaney-Snell Dep., R.30-4, PageID 571–72. He next claimed that he raised his hands but that Young punched him. *Id.*, PageID 573. This force led Chaney-Snell to put his hands down, so the officers demanded that he "put [his] hands up" again. *Id.* He conceded that he disobeyed this second command and that the officers had to give the same order more than once. *Id.* When he admitted at his plea hearing that he did not follow the officers' commands, Chaney-Snell suggested at his deposition that he was referring to this point in the encounter. *Id.*, PageID 571–73, 605–06.

While tension might exist between Chaney-Snell's statements across the two cases, he has reconciled them enough to avoid a "clearly inconsistent" finding. *See Lorillard Tobacco*, 546 F.3d at 758. At his plea hearing, he admitted both that the officers at "some" unidentified "point" told him to show his hands and that he "failed to comply with . . . the lawful command of" one of the officers. Plea Tr., R.30-8, PageID 765. At his deposition, he clarified that this point occurred after Young had punched him and when the officers were shouting for him to raise his hands a "second time." Chaney-Snell Dep., R.30-4, PageID 605. "Regardless of the merits of" Chaney-Snell's allegations in this civil case, they reconcile his statements across the two cases. *Lorillard Tobacco*, 546 F.3d at 758. And while Chaney-Snell might "find it difficult to convince a jury" that he would plead guilty to resisting arrest in light of Young's alleged actions, we do not assess his credibility at this stage. *Gambrel*, 25 F.4th at 404; *see Schreiber*, 596 F.3d at 333.

Young responds with narrow and broad arguments. Narrowly, he identifies a technical difference between Chaney-Snell's statements. At his plea hearing, Chaney-Snell admitted that the officers shouted for him "to *show*" his hands. Plea Tr., R.30-8, PageID 765 (emphasis added). At his deposition, Chaney-Snell said he failed to comply with the command "to *put . . . up*" his hands. Chaney-Snell Dep., R.30-4, PageID 573 (emphasis added). Yet this "subtle" distinction does not reveal the clear contradiction that could warrant judicial estoppel, especially considering the summary nature of the plea hearing. *Lorillard Tobacco*, 546 F.3d at 758. Indeed, Chaney-Snell viewed the two commands as "the same thing." Chaney-Snell Dep., R.30-4, PageID 605.

More broadly, Young reasserts his *Heck* claim using the judicial-estoppel label. Even if Chaney-Snell's summary of events at his deposition comports with his admissions at his plea hearing, Young argues, the summary at least conflicts with the criminal *judgment*. As noted, the resisting-arrest statute gives residents the "right to resist unlawful police conduct[.]" *Moreno*, 814 N.W.2d at 629. If Chaney-Snell refused to raise his hands because Young had just punched him, Young argues that Chaney-Snell resisted Young's unlawful conduct. So his deposition testimony would "imply the invalidity of his conviction[.]" *Heck*, 512 U.S. at 487. But we refuse to enforce the *Heck* bar in this roundabout way. Unlike *Heck*, judicial estoppel applies beyond § 1983 suits. So if judicial estoppel bars Chaney-Snell from raising any claim inconsistent with his criminal case, would it also bar him from challenging his conviction in habeas? Even though state prisoners regularly bring habeas claims, Young cites no authority that has applied estoppel in this way. *See Thore*, 466 F.3d at 183; *see also Wells*, 707 F.3d at 761. Next, unlike a *Heck* holding, an estoppel holding typically produces a dismissal with (not without) prejudice. *See Han*, 799 F. App'x at 350. If Young correctly claims that *Heck* applies, then, a decision to enforce the *Heck* bar through judicial estoppel would deprive Chaney-Snell of any ability to refile the suit if he overturned his conviction. *See Wheeler*, 807 F.3d at 767. In short, Young can raise his *Heck* claim in our court at the appropriate time. We will not consider the *Heck* bar through judicial estoppel.

B.     *Question Two: Does the Fourth Amendment permit officers to use unnecessary force on arrestees if the force qualifies as "de minimis"?*

Unable to rebut Chaney-Snell's allegations about the punches, Deputy Young turns to Chaney-Snell's allegations that an officer kneed him in the back and dragged him across the floor. Young does not assert that *Heck* bars these uses of force, presumably because they allegedly occurred *after* the officers arrested him. *See Hayward*, 759 F.3d at 611–12. Rather, Young and Officer Teichow both argue that the district court wrongly denied them qualified immunity even accepting Chaney-Snell's allegations. The Supreme Court's caselaw leaves no doubt that we have jurisdiction over this qualified-immunity issue. *See Plumhoff v. Rickard*, 572 U.S. 765, 771–73 (2014). Even so, neither the Fourth Amendment nor our caselaw support their position.

1

To defeat the officers' qualified-immunity defense, Chaney-Snell "must prove two things." *Gambrel*, 25 F.4th at 399. He first must show that the officers violated the Fourth Amendment. *Id.* He then must show that our law clearly established this violation at the time of his arrest. *Id.*

Before considering this two-part test, we clarify factual and legal points about the officers' qualified-immunity request. Factually, some uncertainty exists over the allegedly responsible officer because Chaney-Snell could not identify who kneed or dragged him. The record clears up a part of this uncertainty: Only Deputy Young could have kneed Chaney-Snell. Young admitted that, when he used knee strikes attempting to handcuff Chaney-Snell, his knee "made contact" with Chaney-Snell's "left side or part of his back[.]" Young Dep., R.30-7, PageID 732. Meanwhile, Officer Teichow "did not kneel on" Chaney-Snell at all. Teichow Dep., R.30-6, PageID 700. No jury could identify Teichow as the "kneeing" officer on this record. Yet the record does leave unclear which officer would have dragged Chaney-Snell (if the jury believed him). So Young and Teichow both assert the same qualified-immunity theory.

That brings us to the legal point. The officers raise a unique qualified-immunity defense to sidestep our caselaw. We have repeatedly held that the police violate the Fourth Amendment

if they use "gratuitous" force on an arrestee who has surrendered and poses no threat. *Gambrel*, 25 F.4th at 402 (quoting *Shreve v. Jessamine Cnty. Fiscal Ct.*, 453 F.3d 681, 688 (6th Cir. 2006)); *see Reed v. Campbell County*, 80 F.4th 734, 750 (6th Cir. 2023); *Williams*, 9 F.4th at 438–39; *Miller v. Sanilac County*, 606 F.3d 240, 252–54 (6th Cir. 2010); *Morrison v. Bd. of Trs. of Green Twp.*, 583 F.3d 394, 404–05, 407 (6th Cir. 2009); *Pigram ex rel. Pigram v. Chaudoin*, 199 F. App'x 509, 513 (6th Cir. 2006); *Baker v. City of Hamilton*, 471 F.3d 601, 607–08 (6th Cir. 2006); *Phelps v. Coy*, 286 F.3d 295, 301 (6th Cir. 2002); *Holmes v. City of Massillon*, 78 F.3d 1041, 1048 (6th Cir. 1996); *Adams v. Metiva*, 31 F.3d 375, 387 (6th Cir. 1994); *McDowell v. Rogers*, 863 F.2d 1302, 1307 (6th Cir. 1988). Because we must accept Chaney-Snell's allegations that he had peaceably surrendered before he was kneed and dragged, the officers do not challenge his claim that they used "gratuitous" force. *Morrison*, 583 F.3d at 407 (citation omitted).

Rather, they argue that they did not violate the Fourth Amendment for a different reason: because "'the Constitution is not concerned'" with the "de minimis level of force" that Chaney-Snell alleges. Young Appellant's Br. 30 (quoting *Hanson v. Madison Cnty. Det. Ctr.*, 736 F. App'x 521, 530 (6th Cir. 2018)). Under the officers' proposed rule, the Fourth Amendment exempts gratuitous force that falls below a minimum threshold. They further claim that Chaney-Snell's alleged force (kneeing and dragging an arrestee) does not reach the required level.

This claim lacks merit. For starters, the officers propose a broad-brush rule that de minimis force falls outside the *entire Constitution*. But this case involves a *specific constitutional provision*: the Fourth Amendment. That amendment does not expressly distinguish de minimis force from major force. It instead gives "the people" a "right" "to be secure in their persons . . . against unreasonable . . . seizures[.]" U.S. Const. amend. IV. All agree that the officers "seized" Chaney-Snell when they successfully arrested him. *See Torres v. Madrid*, 592 U.S. 306, 311–18 (2021).

As a result, the officers' proposed de minimis rule turns on the word "unreasonable." When interpreting this adjective, the Supreme Court has sometimes looked to the common-law rules governing police conduct. *See Lange v. California*, 141 S. Ct. 2011, 2022 (2021). But when the Court has found no "precise guidance" in history, it has turned to a balancing of the

interests at stake.  *Riley v. California*, 573 U.S. 373, 385–86 (2014).  Either way, the officers' rule falls short.

*Balancing*.  The Supreme Court typically follows its balancing approach when analyzing excessive-force claims, so we begin there.  *See Graham v. Connor*, 490 U.S. 386, 396 (1989); *Tennessee v. Garner*, 471 U.S. 1, 7–8 (1985).  This approach requires courts to weigh an officer's reasons for the force against an arrestee's interest in avoiding it.  *See Phelps*, 286 F.3d at 301.  Courts must undertake this balancing "from the perspective 'of a reasonable officer'" who knows that dangerous encounters often require "split-second" decisions.  *Plumhoff*, 572 U.S. at 775 (quoting *Graham*, 490 U.S. at 396–97).  And courts must engage in an objective review of all the circumstances, not a subjective review of an officer's motives.  *See Graham*, 490 U.S. at 397.

This balance of interests favors Chaney-Snell under his factual allegations.  First consider the public interests of Young and Teichow.  The officers undoubtedly had important safety concerns that justified detaining Chaney-Snell during the search of his girlfriend's home.  *See Muehler v. Mena*, 544 U.S. 93, 98 (2005).  And their right to detain Chaney-Snell gave them the subsidiary right to use the "physical coercion or threat thereof" required to "effect" his detention. *Graham*, 490 U.S. at 396.  Yet, under the version of events that we must accept, the officers had already detained Chaney-Snell when Young kneed him in the back and an officer dragged him across the floor.  The officers thus have not identified *any* "legitimate government interest" for these additional uses of force.  *Morrison*, 583 F.3d at 404.

Now consider Chaney-Snell's private interests.  Admittedly, he alleges that this modest force caused minor injuries: an asthma attack from the kneeing and a rug burn from the dragging. But we have "never imposed a *de minimis* injury" exception to our longstanding rule that the use of gratuitous force on an incapacitated arrestee renders a seizure unreasonable.  *Reed*, 80 F.4th at 750.  To the contrary, we have consistently rejected claims that officers could escape liability for similar levels of force on the ground that it caused minor injuries.  *See Miller*, 606 F.3d at 253– 54; *Ingram v. City of Columbus*, 185 F.3d 579, 597 (6th Cir. 1999).  Two examples prove this point.  We have held that an officer used excessive force when he repeatedly pushed a detained woman's face into the ground to prevent her from talking, even though this force caused just a

"minor scratch[.]" *Morrison*, 583 F.3d at 406–07. And we have held that an officer used excessive force when he slapped a detained high-school student for talking back to the officer, without considering whether the slap caused any injury. *Pigram*, 199 F. App'x at 511, 513–14.

This case should be no different. Even if we could describe the force that Chaney-Snell alleges as a "marginal intrusion," *Mena*, 544 U.S. at 99, it was an intrusion all the same. And Teichow and Young point to no interest on the other side to counterbalance this intrusion. Under Chaney-Snell's alleged facts, then, the balance has a clear winner.

*History*. For good measure, nothing in the historical record cuts against this conclusion. The Supreme Court often ties the word "unreasonable" in the Fourth Amendment to the common-law rules in place at the time of its enactment. *See Lange*, 141 S. Ct. at 2022–23. Indeed, the Court has suggested that the amendment "must provide *at a minimum* the degree of protection it afforded when it was adopted." *Id.* at 2022 (quoting *United States v. Jones*, 565 U.S. 400, 411 (2012)). After all, the founding generation may have read the word to mean contrary to the "reason of the common law." Laura K. Donohue, *The Original Fourth Amendment*, 83 U. Chi. L. Rev. 1181, 1269–75 (2016). So, for example, the Fourth Amendment generally requires officers to knock and announce their presence before searching a home because many common-law sources imposed that requirement. *See Wilson v. Arkansas*, 514 U.S. 927, 931–36 (1995). And if officers have probable cause that a suspect committed a felony, they may arrest the suspect without a warrant because of the "ancient common-law rule" permitting those arrests. *United States v. Watson*, 423 U.S. 411, 418 (1976).

Here, however, Young and Teichow do not identify any historical authorities that would treat Chaney-Snell's alleged force as insufficient. As far as we can tell, those authorities instead confirm our rule that officers may employ only the force reasonably necessary to effect an arrest. Ilan Wurman, *Qualified Immunity and Statutory Interpretation*, 37 Seattle U. L. Rev. 939, 966 & n.174 (2014). At common law, parties "historically enforced their rights" using tort actions. *Utah v. Strieff*, 579 U.S. 232, 237 (2016). So plaintiffs would pursue battery claims against arresting officers who harmed them. *See Williams v. Jones*, 95 Eng. Rep. 193, 194 (K.B. 1736); *Truscott v. Carpenter*, 91 Eng. Rep. 1050, 1051 (K.B. 1697). And the common law treated even "[t]he least touching of another's person willfully, or in anger," as an actionable "battery[.]"

3 William Blackstone, *Commentaries on the Laws of England* 120 (1768); *see Torres*, 592 U.S. at 314.

In response to these tort claims, officers sometimes sought to excuse a battery on the ground that they were making a "lawful" arrest. *Williams*, 95 Eng. Rep. at 194. This defense fell short: "a battery cannot be justified by shewing an arrest barely[.]" *Id.*; 1 Matthew Bacon, *A New Abridgment of the Law* *244–45 n.*(c)* (1st Am. ed. 1811). Officers instead had to justify the battery on one of two other grounds. They might assert the defense of "*molliter manus imposuit*" ("[h]e gently laid hands on"), meaning that they used only the force required for the arrest. *Rowe v. Tutte*, 125 Eng. Rep. 1031, 1031–33 (C.P. 1737); *Black's Law Dictionary* 1158 (10th ed. 2014); *cf.* Blackstone, *supra*, at 121. For greater force, they had to allege that the arrestee "made resistance and was going to rescue himself[.]" *Williams*, 95 Eng. Rep. at 194. Or, as another case put it, an officer "cannot beat [an arrestee], unless he resists" the arrest. *Truscott*, 91 Eng. Rep. at 1051.

This framework continued through the adoption of the Fourteenth Amendment and its incorporation of the Fourth Amendment against the States. *See* Wurman, *supra*, at 966–72 (citing cases). One can find many decisions suggesting that a person with the "authority to arrest" had to carry out the arrest "peaceably, and with as little violence as the case will admit of." *State v. Mahon*, 3 Del. 568, 569 (1842). Officers thus needed to show "resistance" on an arrestee's part to "justify" "acts" like "dragging" or "striking" the arrestee. *Kreger v. Osborn*, 7 Blackf. 74, 74–75 (Ind. 1843); *see Schwenke v. Union Depot & R.R. Co.*, 21 P. 43, 44 (Colo. 1889); *Golden v. State*, 1 S.C. 292, 302 (1870); *Murdock v. Ripley*, 35 Me. 472, 474 (1853); *Boles v. Pinkerton*, 7 Dana 453, 453–54 (Ky. 1838); *cf. Gates v. Lounsbury*, 20 Johns. 427, 429 (N.Y. Sup. Ct. 1823). As a treatise suggested in the decades after the Fourteenth Amendment's adoption, the law "will tolerate in its ministers no unnecessary violence." William L. Murfree, Sr., *A Treatise on the Law of Sheriffs and Other Ministerial Officers* § 148, at 73 (1884). So arresting officers could use only that "physical force" that was "the very *minimum* by which the desired object can be attained." *Id.* at 74; *see* 2 Joel Prentiss Bishop, *Commentaries on the Criminal Law* § 58, at 35 (4th ed. 1868).

Accepting Chaney-Snell's allegations, Young and Teichow could not justify their force as a historical matter. Nobody would describe their actions in kneeing and dragging Chaney-Snell as "gently lay[ing] their hands" on him. *Rowe*, 125 Eng. Rep. at 1032. Chaney-Snell also allegedly offered no "resistance" to justify this force. *Williams*, 95 Eng. Rep. at 194. And since the force exceeded the "touching" required for battery, Blackstone, *supra*, at 120, Chaney-Snell could have sued the officers in tort. In sum, no matter how we approach this question, Young and Teichow have not shown that the force alleged in this case fell into a de minimis exception to our traditional rule that the Fourth Amendment bars the use of gratuitous force on neutralized arrestees.

2

The officers' contrary arguments do not change things. They first point out that "'[n]ot every push or shove, even if it may later seem unnecessary in the peace of the judge's chambers,' violates the Fourth Amendment." *Graham*, 490 U.S. at 396 (citation omitted). According to Young and Teichow, this sentence from *Graham* excludes minor force like a "push" or "shove" from the Fourth Amendment's reach. Not so. The Court was merely clarifying that judges should give officers leeway over whether force was *necessary*; it was not holding that judges should give officers a free pass to wield *unnecessary* force that falls below some threshold.

Confirming this point, the Supreme Court has required the police to identify law-enforcement reasons even for more modest force than that alleged here. Take *Mena*. It held that the police properly left an occupant of a home in handcuffs for hours while they searched the home. *See Mena*, 544 U.S. at 99–100. The Court did not suggest that the hours-long handcuffing was "de minimis"; it held that the police had reasonable safety reasons to keep the occupant secured. *See id.* Or take *Los Angeles County v. Rettele*, 550 U.S. 609 (2007) (per curiam). There, the Court held that officers used reasonable force when they ordered a naked couple out of bed and required them to stand without clothes for two minutes while securing their home. *Id.* at 611, 614–16. Here again, the Court did not find this force "de minimis"; it found that the officers kept the couple in this embarrassing state for no "longer than necessary to protect their safety." *Id.* at 615.

Unable to rely on the Supreme Court's Fourth Amendment jurisprudence, the officers switch to its caselaw on other provisions. *See Wilkins v. Gaddy*, 559 U.S. 34, 37–38 (2010); *Bell v. Wolfish*, 441 U.S. 520, 539 n.21 (1979). In *Wilkins*, the Court held that the Eighth Amendment's ban on cruel and unusual punishments did not reach "*de minimis* uses of physical force[.]" 559 U.S. at 38 (quoting *Hudson v. McMillian*, 503 U.S. 1, 10 (1992)). And when considering the limits that jailers may impose on pretrial detainees under the Fourteenth Amendment's Due Process Clause, the Court in *Bell* noted that "[t]here is, of course, a *de minimis* level of imposition with which the Constitution is not concerned." 441 U.S. at 539 n.21 (quoting *Ingraham v. Wright*, 430 U.S. 651, 674 (1977)).

But these cases addressed different provisions with different texts. Because the Eighth Amendment bars only "'cruel and unusual' deprivations," it does not reach "uncomfortable or 'even harsh'" sanctions. *Johnson v. Sootsman*, 79 F.4th 608, 615 (6th Cir. 2023) (citation omitted). Thus, *Wilkins*'s view that the phrase "cruel and unusual" in the Eighth Amendment excludes minor force says little about whether an "unreasonable seizure" under the Fourth Amendment *also* excludes that force. Similarly, the Due Process Clause bars States from "depriv[ing]" people of their "liberty" "without due process of law[.]" U.S. Const. amend. XIV, § 1. And *Bell*'s view that a "*de minimis* level of imposition" may not intrude on the liberty protected by due process says little about whether minor force can render a "seizure" "unreasonable" under the Fourth Amendment. *Bell*, 441 U.S. at 539 n.21 (quoting *Ingraham*, 430 U.S. at 674).

Having run out of Supreme Court precedent, Young and Teichow next cite our own. They rely on two cases addressing excessive-force claims brought by *pretrial detainees* in jail. *See Hanson*, 736 F. App'x at 526–28 & nn.3–4; *Leary v. Livingston County*, 528 F.3d 438, 443 (6th Cir. 2008). *Leary* held that the Due Process Clause's liberty protections did not reach the minor force that a pretrial detainee alleged in that case: a "karate chop" that caused no harm. 528 F.3d at 443–45. But again, this due-process holding says little about the rules that should govern claims brought by "free citizen[s]" under the Fourth Amendment. *Id.* (quoting *Graham*, 490 U.S. at 394).

*Hanson* at least concerned the Fourth Amendment. 736 F. App'x at 527–28. We noted that the shove of a pretrial detainee against a jail wall did not violate the Fourth Amendment because of its minor nature. *Id.* at 529–31. But *Hanson* equated the Fourth Amendment's reasonableness standards in the pretrial-detainee context with the Supreme Court's due-process standards in that context. *See id.* at 528–29, 528 n.3 (citing *Kingsley v. Hendrickson*, 576 U.S. 389 (2015)). In *Kingsley*, the Court clarified that these standards must account for a jail's unique security needs. 576 U.S. at 399–400. Those unique needs may justify *Hanson*'s suggestion that a pretrial detainee must show more than de minimis force to violate the Fourth Amendment. 736 F. App'x at 530–31. If, however, we expand *Hanson* beyond a jail's walls, we would place it on a collision course with our many cases holding that even "minor uses of force" (such as a slap) violate the Fourth Amendment when they are "totally gratuitous." *Gaddis ex rel. Gaddis v. Redford Township*, 364 F.3d 763, 772 (6th Cir. 2004) (citation omitted); *see Pigram*, 199 F. App'x at 511, 513. And this case concerns force against a "free citizen" in a home, not a pretrial detainee at a jail. *Graham*, 490 U.S. at 394.

Because our precedent does not help them, Young and Teichow turn to out-of-circuit caselaw. We find this precedent "muddled." *Fisher v. City of Las Cruces*, 584 F.3d 888, 898 n.5 (10th Cir. 2009). Some courts have suggested that plaintiffs must show more than a de minimis *injury* to establish a Fourth Amendment violation. *See Westfall v. Luna*, 903 F.3d 534, 549–50 (5th Cir. 2018) (per curiam). Others have suggested that plaintiffs must show more than de minimis *force* to establish such a violation. *See Chambers v. Pennycook*, 641 F.3d 898, 906 (8th Cir. 2011); *Nolin v. Isbell*, 207 F.3d 1253, 1257 (11th Cir. 2000). In the end, these differing standards are beside the point. "[S]ince 1991," our precedent has turned on the *gratuitous* nature of the force—not the *de minimis* nature of the force or of any resulting injury. *Solovy v. Morabito*, 375 F. App'x 521, 528 (6th Cir. 2010); *Phelps*, 286 F.3d at 301–02. No matter what other circuits say, we must follow that precedent here.

This conclusion rebuts the officers' final argument: that our cases did not give Chaney-Snell a "clearly established" right against the purportedly de minimis force that he alleged. *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (per curiam) (citation omitted). Undoubtedly, the Supreme Court has adopted a demanding test for Chaney-Snell to prove the violation of a

clearly established right at the second step of the qualified-immunity analysis. He must show that "every reasonable" officer would have realized that Young and Teichow's conduct violated the Fourth Amendment under our then-existing precedent. *Id.* (citation omitted). In the fact-dependent excessive-force context, moreover, this test generally requires a plaintiff to identify a highly specific right or a case with analogous facts. *See id.* at 6; *District of Columbia v. Wesby*, 583 U.S. 48, 63–64 (2018).

Still, Chaney-Snell has met this demanding test. To begin with, our cases have "clearly established that an officer may not use additional gratuitous force once a suspect has been neutralized." *Morrison*, 583 F.3d at 408 (citation omitted); *Shreve*, 453 F.3d at 688. We have stated this legal rule at a specific-enough level of generality for purposes of this case because "the unlawfulness" of the gratuitous force that Chaney-Snell alleges "follow[s] immediately from [our] conclusion that [the rule is] firmly established." *Wesby*, 583 U.S. at 64 (citation omitted). In addition, our cases addressing similar levels of force put Young and Teichow "on notice" that the alleged conduct violated the Fourth Amendment. *Rivas-Villegas*, 595 U.S. at 6. As one example, *Morrison*—the case in which an officer pushed an arrestee's "face into the ground" and caused a "minor scratch"—unambiguously shows that minor force causing a minor injury can violate the Fourth Amendment. 583 F.3d at 406, 408; *see Miller*, 606 F.3d at 252–54.

We end with two disclaimers. As for the first disclaimer, courts have suggested that § 1983 does not provide a cause of action for "trifling" injuries—whether a plaintiff alleges a violation of the First Amendment, the Fourth Amendment, or any other right—because the statute incorporates the common-law maxim *de minimis non curat lex* (the law does not concern itself with trifles). *Williams v. Boles*, 841 F.2d 181, 182–83 (7th Cir. 1988); *see Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982). We need not consider this *statutory* question, though, because the officers raise only a *constitutional* argument about the Fourth Amendment. As for the second disclaimer, courts have suggested that the minor nature of the force or injury supports an officer's claim that the officer used reasonably *necessary* force to subdue an arrestee. *See Williams v. Sirmons*, 307 F. App'x 354, 360–61 (11th Cir. 2009) (per curiam); *cf. Sootsman*, 79 F.4th at 618–19; *Gaddis*, 364 F.3d at 772. We also need not consider this constitutional question because Young and Teichow do not attempt to justify the alleged kneeing and dragging

as reasonably necessary.  Rather, they argue that even unnecessary force falls outside the Fourth Amendment when it is de minimis.  That rule conflicts with our law.

C.     *Question Three: Has Chaney-Snell established a "failure to intervene" theory of liability?*

Officer Teichow lastly argues that qualified immunity protects him from the claim that he failed to stop Deputy Young from punching Chaney-Snell in the face and kneeing him in the back.  And because the record leaves unclear which officer dragged Chaney-Snell, Young and Teichow both seek qualified immunity for the claim that they failed to stop this final use of force.  This argument fares better than their others.  A reasonable officer could have believed that these fleeting uses of force did not last long enough to trigger any duty to intervene.  So Chaney-Snell's claims fail at step two of the qualified-immunity analysis.

1

Section 1983 generally prohibits a plaintiff from holding one officer liable for another's actions.  *See Pineda v. Hamilton County*, 977 F.3d 483, 490 (6th Cir. 2020).  A plaintiff instead may seek damages from an officer only for that officer's "own individual" conduct.  *Iqbal*, 556 U.S. at 676.  And an officer's "mere presence" at the scene of excessive force generally does not suffice to hold the officer liable for the force.  *Burgess v. Fischer*, 735 F.3d 462, 475 (6th Cir. 2013).  This reading of § 1983 ostensibly poses a problem for Chaney-Snell because he seeks damages not just from the officer who employed the alleged force but also from the officer who witnessed it.

Since *Bruner v. Dunaway*, 684 F.2d 422 (6th Cir. 1982) (per curiam), however, we have held that an officer who fails to intervene to prevent another officer's excessive force can face liability for that force under § 1983.  *Id.* at 425–26; *see Goodwin v. City of Painesville*, 781 F.3d 314, 328–29 (6th Cir. 2015); *Durham v. Nu'Man*, 97 F.3d 862, 866–68 (6th Cir. 1996).  That said, our cases leave the *source* of this failure-to-intervene theory unclear.  Two possible sources exist.  On the one hand, a constitutional amendment might enshrine this duty to intervene in our fundamental charter.  But which amendment?  The Fourth Amendment protects only against "unreasonable" "seizures"; its text does not obviously cover the *failure* to stop such seizures.

U.S. Const. amend. IV.   *Bruner* hinted at the Equal Protection Clause as a possible source because it supported this failure-to-intervene theory with a quote from *Smith v. Ross*, 482 F.2d 33 (6th Cir. 1973) (per curiam).   *See Bruner*, 684 F.2d at 426.   In a different context, *Smith* suggested that officers might violate "equal protection" if they do not "enforce the laws equally and fairly[.]"   482 F.2d at 36.   As another constitutional possibility, we have held that the Due Process Clause can require officials to protect private parties from so-called "state-created dangers."   *See Doe v. Jackson Loc. Sch. Dist. Bd. of Educ.*, 954 F.3d 925, 931–32 (6th Cir. 2020).

On the other hand, perhaps § 1983's text incorporates this duty to intervene into the statute itself rather than the Constitution.   *See Manuel v. City of Joliet*, 580 U.S. 357, 370 (2017). When deciding on the "elements" of a cause of action for a constitutional violation under § 1983, courts have read the statute with "the common law of torts" in mind.   *Id.*; *see Dibrell v. City of Knoxville*, 984 F.3d 1156, 1160 (6th Cir. 2021).   Courts thus have looked to the common law to decide which actors may be held liable for a constitutional violation.   *See Pineda*, 977 F.3d at 490.   Conspiracy allegations, for example, allow a plaintiff to hold one conspirator responsible for another's actions under § 1983 because a coconspirator could face that liability at common law.   *See Rudd v. City of Norton Shores*, 977 F.3d 503, 512–13 (6th Cir. 2020).   *Bruner* alternatively hinted at this statutory theory for failure-to-intervene claims by citing a Seventh Circuit case as further support.   *See* 684 F.2d at 425–26 (citing *Byrd v. Brishke*, 466 F.2d 6 (7th Cir. 1972)).   *Byrd* relied on tort analogies to incorporate failure-to-intervene claims into § 1983. *See* 466 F.2d at 10–11.

Perhaps one day we will have to identify the source of this failure-to-intervene claim when deciding its proper scope.   *Cf. White v. Goforth*, 2023 WL 3546527, at *3 (6th Cir. May 18, 2023).   But today is not the day.   Whatever the claim's source, we have long followed a two-part test to hold officers liable for failing to stop excessive force.   *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997).   An officer must have "observed" the force "or had reason to know" a colleague would use it.   *Id.*   And the officer must have "had both the opportunity and the means" to stop it.   *Id.*

The parties debate only the second part of our test here. To establish that part, a plaintiff generally must show that the primary wrongdoer used the force for a "long enough" time that the observing officer had a realistic chance to end it. *Pelton v. Perdue*, 731 F. App'x 418, 426 (6th Cir. 2018). How long is "long enough"? Our caselaw offers guidance at the extremes.

At one extreme, an officer without forewarning generally will not have the ability to stop a colleague's force if the force continues for "ten seconds or less[.]" *Pineda*, 977 F.3d at 493 (quoting *Alexander v. Carter ex rel. Byrd*, 733 F. App'x 256, 265 (6th Cir. 2018)). So officers could not face liability for a colleague's quick blow to the head or shove into a wall. *See id.* at 487, 493; *Turner*, 119 F.3d at 427, 429–30; *Bonner-Turner v. City of Ecorse*, 627 F. App'x 400, 403–04, 412 (6th Cir. 2015); *Amerson v. Waterford Township*, 562 F. App'x 484, 487, 489–90 (6th Cir. 2014). Officers also could not face liability for a colleague's "takedown" that lasted no "more than ten seconds[.]" *Burgess*, 735 F.3d at 475–76; *see LaPlante v. City of Battle Creek*, 30 F.4th 572, 582 (6th Cir. 2022); *Pelton*, 731 F. App'x at 426. They could not face liability for a colleague's decision to tase or shoot a suspect when this force ended in seconds. *See Pennington v. Terry*, 644 F. App'x 533, 548 (6th Cir. 2016); *Kowolonek v. Moore*, 463 F. App'x 531, 539 (6th Cir. 2012); *Murray-Ruhl v. Passinault*, 246 F. App'x 338, 347–48 (6th Cir. 2007). And they could not face liability for a colleague's decision to drive a police car into a suspect in "six to seven seconds." *Ontha v. Rutherford County*, 222 F. App'x 498, 506–07 (6th Cir. 2007).

At the other extreme, an officer generally can stop ongoing force that lasts for a minute or more. So officers could face liability when they watched colleagues continuously beat a suspect for anywhere from 90 seconds to 10 minutes. *Grinnell v. City of Taylor*, 2022 WL 1562291, at *6–7 (6th Cir. May 18, 2022); *Durham*, 97 F.3d at 868; *see Parnell v City of Detroit*, 786 F. App'x 43, 45–46, 51–52 (6th Cir. 2019); *McHenry v. Chadwick*, 896 F.2d 184, 186, 188 (6th Cir. 1990). They could face liability when they saw a colleague kneel on a suspect's back for over a minute. *See Kulpa ex rel. Kulpa v. Cantea*, 708 F. App'x 846, 849, 854 (6th Cir. 2017); *Laury v. Rodriguez*, 659 F. App'x 837, 847–48 (6th Cir. 2016). And they could face liability when they witnessed a colleague choking a suspect or pinning him against a car for many minutes. *See Brigg v. Miles*, 2017 WL 2174252, at *3–4 (6th Cir. Mar. 6, 2017) (order); *Ortiz ex rel. Ortiz v. Kazimer*, 811 F.3d 848, 851, 853 (6th Cir. 2016).

Our decision in *Goodwin* sits between these poles. There, officers entered a home to arrest a suspect. 781 F.3d at 319. One of them fired a taser at him. *Id.* Falling to the ground, the suspect began to convulse as the taser's "current ran through him." *Id.* The officer nevertheless kept the taser activated for 21 seconds. *Id.* During this time, other officers merely tried to handcuff the convulsing suspect without asking their colleague to stop. *Id.* And after the colleague finally ended the first tasing, he tased the suspect for another five seconds. *Id.* We held that the observing officers could have done something to end the "prolonged" 21-second tasing. *Id.* at 328–29.

Aside from the length of the force, we have considered a few other datapoints to decide whether an officer could have prevented it. For example, did the force continue unabated or occur at "discrete" moments? *Well v. City of Dearborn Heights*, 538 F. App'x 631, 634–35, 640 (6th Cir. 2013). Plaintiffs will have a more difficult time showing that an officer could have put an end to short and distinct episodes as compared to "ongoing conduct." *Compare Barton v. City of Lincoln Park*, 726 F. App'x 361, 366–67 (6th Cir. 2018), *with Goodwin*, 781 F.3d at 328–29. Next, what were the observing officers doing during the encounter? Plaintiffs will also have a more difficult time showing that officers could have ended force if they were distracted by other duties rather than merely looking on. *Compare Wright v. City of Euclid*, 962 F.3d 852, 872 (6th Cir. 2020), *and Smith v. City of Troy*, 874 F.3d 938, 945–46 (6th Cir. 2017) (per curiam), *with Kulpa*, 708 F. App'x at 849, 854. Lastly, did prior statements reveal the risk of force or did it come without warning? Plaintiffs will have an easier time holding officers liable for a short use of force if the officer who engaged in it signaled an intent to do so ahead of time. *Compare Kent v. Oakland County*, 810 F.3d 384, 388–89, 397 (6th Cir. 2016), *with Amerson*, 562 F. App'x at 489–90.

2

Chaney-Snell alleges three failure-to-intervene claims: (a) that Teichow should have stopped Young from punching him; (b) that Teichow should have stopped Young from kneeing him; and (c) that one officer should have stopped the other from dragging him. Qualified immunity protects the officers from all three claims because a reasonable officer could believe

that each incident ended too quickly to trigger "a duty to intercede." *Barton*, 726 F. App'x at 367.

a. *Punches*. To start, Teichow lacked an opportunity to stop Young from hitting Chaney-Snell twice in the face. Our cases leave no doubt about this result for the first punch. Young threw that punch "quickly and without any forewarning." *Amerson*, 562 F. App'x at 490. On Chaney-Snell's own account, Young did not say anything that gave Chaney-Snell any "idea" that Young would punch him. Chaney-Snell Dep., R.30-4, PageID 613. In fact, Chaney-Snell "probably would have ducked if [he had] seen it coming." *Id.*, PageID 573. But the punch came too "fast[.]" *Id.* It thus resembles the unexpected blows or tackles that we have held cannot support a failure-to-intervene claim. *See LaPlante*, 30 F.4th at 582; *Turner*, 119 F.3d at 429–30.

We reach the same result for the second punch. To be sure, Chaney-Snell testified that this punch came more than an "instant" after the first (although he could not "put a definite time" on the interlude). Chaney-Snell Dep., R.30-4, PageID 613. This factual allegation distinguishes our cases holding that an officer could not have stopped two blows in rapid succession. *See Amerson*, 562 F. App'x at 489–90. But the allegation also shows that Young did not employ "ongoing" force. *Barton*, 726 F. App'x at 367 (citation omitted). And unlike in *Goodwin*, Chaney-Snell conceded that Young himself had immediately "stopped" the force after the first punch. Chaney-Snell Dep., R.30-4, PageID 608. So the second punch came just as much out of the blue as the first one. Young said nothing to suggest that he might punch Chaney-Snell a second time. *Cf. Kent*, 810 F.3d at 388–89. He merely asked Chaney-Snell two more times to put up his hands. Chaney-Snell Dep., R.30-4, PageID 608, 613. Chaney-Snell thus conceded that he did not "think" Young would "punch [him] for a second time" if he reraised his hands and that he had "no idea" this strike would occur. *Id.*, PageID 609, 613. If even Chaney-Snell could not predict that Young would use this additional force, how could Teichow *both* "perceive what" was about to happen *and* "intercede to stop it"? *Barton*, 726 F. App'x at 366. Chaney-Snell does not say.

As another way of looking at this question, one might ask: What was Teichow supposed to do under the circumstances? Even though Young neither used nor threatened force in between the punches, Chaney-Snell alleges that Teichow had a duty to physically grab Young

immediately after the first punch. Nothing in our existing caselaw would compel such a rule. Recall that the officers were in the dangerous process of rapidly securing a home involved in drug trafficking. The risk of "sudden violence" inherently existed. *Michigan v. Summers*, 452 U.S. 692, 702 (1981). If an officer continuously pummeled a detained occupant while securing a home, our cases would surely require another officer's intervention to stop this force. *Cf. Grinnell*, 2022 WL 1562291, at *1–2, *6–7. But Teichow could reasonably conclude that he did not have a duty to start fighting with Young for an apparently errant (and completed) use of force while they were both attempting to quickly secure a home and detain its occupants. *Cf. Wright*, 962 F.3d at 872.

b. *Kneeing*. The record likewise shows that a reasonable officer could have concluded that Young did not leave his knee in Chaney-Snell's back long enough to require Teichow to intervene. When Chaney-Snell fell to the ground following the second punch, Chaney-Snell alleges, he "put [his] hands behind [his] back" and the officers handcuffed him. Chaney-Snell Dep., R.30-4, PageID 575, 609. Immediately after the handcuffing, an officer (Young) allegedly "had his knee" in Chaney-Snell's back putting pressure on Chaney-Snell with his "body weight[.]" *Id.*, PageID 575. Chaney-Snell told this officer that he could not "breathe" and was "about to run out of breath" due to his asthma. *Id.*, PageID 577–78. The officer got up at some point. *Id.*, PageID 575.

For present purposes, the key question concerns the length of this "kneeing." No reasonable jury could find that it continued for anything more than the "ten seconds" that we have found insufficient to allow another officer to intervene. *Alexander*, 733 F. App'x at 265. As an initial matter, Chaney-Snell admitted that he could not "recall" "how long" Young had a knee in his back. Chaney-Snell Dep., R.30-4, PageID 612. But Young estimated that only "20" to "30 seconds" passed from when the officers breached the front door to when they had Chaney-Snell secured on the bed. Young Dep., R.30-7, PageID 736. The kneeing lasted for a small "fraction" of this time. *Kowolonek*, 463 F. App'x at 539. Teichow also denied even seeing Young pushing his knee into Chaney-Snell's back. He did admit to observing Young deliver knee strikes, but he stated that those strikes "happened very quickly." Teichow Dep., R.30-6, PageID 700. Even Chaney-Snell confessed that "stuff happened so quick," which was

one reason why he did not have a good sense of the timing.  Chaney-Snell Dep., R.30-4, PageID 613.  Given the officers' testimony that the kneeing would have occurred quickly, Chaney-Snell cannot create a genuine issue of material fact merely through his inability to recall how long it lasted.  *Cf. Boykin v. Fam. Dollar Stores of Mich., LLC*, 3 F.4th 832, 839 (6th Cir. 2021).

Even so, Chaney-Snell responds that the kneeing resembles the force in *Goodwin* and *Kent*.  Yet the officers in *Goodwin* continued to use a taser on a "convulsing" arrestee for 21 seconds.  781 F.3d at 319.  The record would not permit a jury to find that Young had his knee in Chaney-Snell's back for a similar period.  Rather, "the entire incident" lasted as long as the tasing in *Goodwin*.  *Kowolonek*, 463 F. App'x at 539.  And while the use of a taser in *Kent* occurred over a much shorter period (five seconds), the officer who used the taser had threatened beforehand that he planned to do so.  *Kent*, 810 F.3d at 388–89, 397.  Teichow received no such "forewarning" that Young planned to knee Chaney-Snell.  *Amerson*, 562 F. App'x at 490.

So Chaney-Snell falls back on two unpublished "kneeing" cases.  *See Kulpa*, 708 F. App'x at 849, 854; *Laury*, 659 F. App'x at 847–48.  His reliance on these cases suffers from two problems.  The officer who placed his knee on the detainee's back in the cases did so for a minute or more.  *See Kulpa*, 708 F. App'x at 849; *Laury*, 659 F. App'x at 848.  In *Kulpa*, the kneeing even killed the detainee.  *See* 708 F. App'x at 849–50.  Nothing of the sort happened here.  Besides, Chaney-Snell could not overcome the second step of the qualified-immunity test by using these cases.  Unpublished decisions cannot create clearly established rights.  *See White*, 2023 WL 3546527, at *6 (citing *Bell v. City of Southfield*, 37 F.4th 362, 367 (6th Cir. 2022)).

c. *Dragging*.  The same timing issue dooms Chaney-Snell's final claim.  After Young got off Chaney-Snell's back, Chaney-Snell alleges, "somebody grabbed" him by the "ankles" and "dragged" him on his "right shoulder."  Chaney-Snell Dep., R.30-4, PageID 575.  Chaney-Snell estimated that the wrongdoer dragged him from the foot of the bed to the doorway of the small bedroom—far "enough for [his] arm to scrape" against the carpet.  *Id.*, PageID 611.  While Chaney-Snell could not put "an amount of seconds" on this dragging, he conceded it was "quick[.]"  *Id.*, PageID 613.  Given the bedroom's small size and Chaney-Snell's concession, no reasonable jury could find that the blameworthy officer dragged him for more than a few feet over a few seconds.  In these circumstances, a reasonable officer could have concluded for a final

time that the officer lacked enough time to intercede to stop the force.  *See Alexander*, 733 F. App'x at 265.

If each use of force happened so fast, how could the district court deny qualified immunity on these failure-to-intervene claims?  Its decision rested on a legal error about qualified immunity's second step.  The court treated *all* the challenged actions (the two punches, the kneeing, and the dragging) as one "ongoing" use of force rather than as "discrete" episodes. *Wells*, 538 F. App'x at 640.  The court thus relied on the length of the entire encounter to conclude that the observing officer (primarily Teichow) had a "long enough" time to prevent seemingly all the applications of force.  *Pelton*, 731 F. App'x at 426; *see Chaney-Snell*, 2022 WL 4667942, at *5.  Yet the only case on which it relied to combine the separate actions in this way—*Goodwin*—considered the *continuous* use of a taser for 21 seconds.  *Chaney-Snell*, 2022 WL 4667942, at *5; *see Goodwin*, 781 F.3d at 329.  This case, by contrast, involves different types of "fleeting" acts.  *Wells*, 538 F. App'x at 640.  When should a court treat distinct acts at different times as a single episode of continuous force?  Perhaps the answer should depend on whether Young's earlier actions (say, the two punches) sufficed to alert a reasonable officer that Young might engage in other types of force (say, the dragging) when completing the arrest.  In the end, though, we need not answer this question.  Because *Goodwin*'s facts do not resemble this case's facts, Chaney-Snell has identified no "clearly established Fourth Amendment" law that compelled the district court's conclusion.  *White*, 2023 WL 3546527, at *6.  So the officers are entitled to qualified immunity.  *See id.*; *Barton*, 726 F. App'x at 367.

\* \* \*

To summarize, we affirm the district court's denial of summary judgment in part and dismiss Young's appeal in part with respect to Chaney-Snell's excessive-force claim tied to the alleged punches.  Next, we affirm the denial of summary judgment to Young on Chaney-Snell's claims that Young kneed him in the back and dragged him on the floor.  We also affirm the denial of summary judgment to Teichow on the dragging claim but reverse that denial on the kneeing claim.  Lastly, we reverse the denial of summary judgment to both officers on the failure-to-intervene claims.  We thus affirm in part, reverse in part, and dismiss in part for lack of jurisdiction.